STATE OF CONNECTICUT *v.* ENRIQUE MARTINEZ
(SC 17333)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued March 8—officially released June 20, 2006

*Robert E. Byron,* for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Joseph T. Corradino,* senior assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The sole issue in this appeal is whether the trial court improperly instructed the jury that it need not be unanimous as to whether its guilty verdict

was predicated on the defendant's conduct as a coconspirator, as opposed to a principal or an accessory. The defendant, Enrique Martinez, appeals[1] from the judgment of conviction, rendered after a jury trial, of attempted murder in violation of General Statutes §§ 53a-49 (a) (2)[2] and 53a-54a (a),[3] conspiracy to commit murder in violation of General Statutes §§ 53a48(a)[4] and 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (1),[5] and kidnapping in the first degree in violation of General Statutes § 53a-

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

92 (a) (2) (C).[6] We conclude that the trial court's instructions deprived the defendant of his constitutional right to a unanimous jury verdict, and we reverse the judgment of conviction on the attempted murder, assault and kidnapping charges, and remand the case for a new trial on those charges.

The jury reasonably could have found the following facts. In July, 2003, the Bridgeport police arrested the victim, Omar Betancourt, an admitted crack dealer, on numerous narcotics charges. At that time, the victim already had assault, narcotics and trespassing charges pending against him, and he became concerned about his increased exposure to a lengthy term of incarceration as a result of the new charges.[7] He, therefore, attempted to reduce his exposure by offering to the police the name of the defendant, a fellow merchant of narcotics from whom the victim had purchased ecstasy pills in the preceding year. In exchange for the police releasing him pursuant to a promise to appear with respect to the new narcotics charges, the victim then contacted the defendant and arranged to purchase unspecified drugs from him at the intersection of Sanford Place and Washington Avenue in Bridgeport. Thereafter, the police and the victim went to that location; when the police saw the defendant's car, a black Honda Accord, they stopped it for various traffic violations, and then arrested the defendant on various narcotics charges.

Several days later, on the afternoon of July 15, 2003, the victim went to the probation office in Bridgeport to report for an appointment with his probation officer. At the probation office, he met the defendant, who also

[6] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to . . . (C) terrorize him or a third person . . . ."

[7] The victim could have been sentenced to anywhere from forty-one to 101 years imprisonment if he were convicted of all of the charges pending against him.

had an appointment there. The two men spoke, and left together in the defendant's car to go "roll up a cigar" with marijuana, presumably intending to smoke it. After purchasing a cigar, they picked up the defendant's cousin, Valerie Bermudez, and went to a house located at Caroline Avenue and Barnum Avenue in Bridgeport.

Once they arrived at the house, the defendant accused the victim of setting him up with the police, and "smack[ed] [him] around" with the handle of a knife. The defendant then took the victim to a bedroom that was occupied by two pit bulls. Shortly thereafter, the victim escaped from the bedroom by jumping out a second story window, fracturing his wrist in the process. As the victim attempted to flee the area by commandeering a car on Barnum Avenue, the defendant blocked that car with his own vehicle, and took him back to the house where the defendant and two other men tied him up in the basement with ropes and shackles. Subsequently, Bermudez and another man, Alex Gonzalez, untied the victim and, holding him at gunpoint with a chrome .45 caliber semiautomatic pistol, brought him upstairs, where the defendant told him that he would bring him home.

The defendant and Gonzalez, however, brought the victim to a house on Iranistan Avenue where they put him in the garage until approximately 5 a.m., the following morning, at which point the defendant said that he would take the victim home. After they drove toward the victim's home on Chestnut Street, the defendant, the victim and Gonzalez walked into a nearby backyard where another man, who had tattoos on both forearms and had his face covered by a towel, suddenly appeared, pointed a gun at the victim, and fired. The gun, however, jammed, and all three assailants began to struggle with the victim. As the victim worked free and began to run away, he looked back and saw the defendant with a gun, which was the same chrome gun previously used

by Gonzalez. The defendant then shot the victim in the leg, and joined the other two assailants in beating him while he was on the ground.[8] One of the three men then shot the victim in the abdomen.[9] The three assailants then fled the scene. The defendant's flight from the scene was witnessed by several neighborhood residents, including the victim's sister, who knew the defendant through his drug related activities. The police subsequently apprehended the defendant later that day following a chase that ended when the defendant drove his car into a tree.[10]

The state charged the defendant with one count of attempted murder in violation of §§ 53a-49 (a) (2) and 53a-54 (a), one count of conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a), one count of assault in the first degree in violation of § 53a-59 (a) (1), one count of kidnapping in the first degree in violation of § 53a-92 (a) (2) (C), one count of carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and one count of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). In the second part of the information, the state also charged the defendant with one count of commission of an offense while released on bond in violation of General Statutes § 53a-40b.[11] Thereafter, the case was

[8] Several neighborhood residents heard the gunshots and witnessed the defendant and the other men beating the victim. One resident did not see the incident, but heard the victim say to the defendant, "Stop hitting me, Rick."

[9] According to the testimony of Kimberly Vinhais, a Bridgeport detective, and Marshall Robinson, a firearms examiner, police investigating the crime scene found shells from two different calibers of bullet on the scene, specifically: (1) one .40 caliber live bullet; (2) three shells from .40 caliber bullets; and (3) five shells from .45 caliber bullets. Laboratory analysis of these shells indicated that the bullets of the same caliber had been fired by the same gun.

[10] Several residents, including the victim's sister, heard the gunshots and saw the defendant running to a black Honda, although there was some inconsistent testimony at trial about whether he had fled in his black Honda Accord or a white Dodge Stratus that also was in the area.

[11] General Statutes § 53a-40b provides: "A person convicted of an offense committed while released pursuant to sections 54-63a to 54-63g, inclusive,

tried to the jury, which returned a verdict of guilty on all counts except for the firearms charges, and found that the defendant had committed those offenses while out on bond in violation of § 53a-40b.[12] The trial court then sentenced the defendant to a total effective sentence of seventy-eight years imprisonment, and rendered judgment accordingly. This appeal followed.

On appeal, the defendant claims that he was denied his constitutional right to a unanimous jury verdict[13] because the trial court did not instruct the jury that it was required to agree unanimously on whether the factual basis for a guilty verdict on the attempted murder, assault and kidnapping charges was as a coconspirator under the *Pinkerton* doctrine,[14] as opposed to a princi-

or sections 54-64a to 54-64c, inclusive, other than a violation of section 53a-222, may be sentenced, in addition to the sentence prescribed for the offense to (1) a term of imprisonment of not more than ten years if the offense is a felony, or (2) a term of imprisonment of not more than one year if the offense is a misdemeanor."

[12] After the jury returned its guilty verdict, the defendant conceded culpability on another pending charge that he had violated his probation, and the trial court then found by a preponderance of the evidence that he had violated his probation.

[13] "It is settled doctrine in Connecticut that a valid jury verdict in a criminal case must be unanimous." *State* v. *Daniels*, 207 Conn. 374, 388, 542 A.2d 306, after remand for articulation, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989). "The possibility of disagreement by the jury is implicit in the requirement of a unanimous verdict and is part of the constitutional safeguard of trial by jury." (Internal quotation marks omitted.) *State* v. *Sawyer*, 227 Conn. 566, 576, 630 A.2d 1064 (1993). The jury is required to "agree on the factual basis of the offense. The rationale underlying the requirement is that a jury cannot be deemed to be unanimous if it applies inconsistent factual conclusions to alternative theories of criminal liability." (Internal quotation marks omitted.) *State* v. *Suggs*, 209 Conn. 733, 761, 553 A.2d 1110 (1989).

[14] In *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), "the United States Supreme Court held that a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." *State* v. *Walton*, 227 Conn. 32, 43, 630 A.2d 990 (1993).

pal or an accessory, and further "compounded the harm" by expressly instructing the jury that it need not be unanimous as to the theory underlying the defendant's guilt. The defendant claims that a separate unanimity instruction was required because *Pinkerton* liability is conceptually distinct from accessorial liability, which, under General Statutes § 53a-8 (a),[15] is statutorily equivalent to principal liability, because the former calls for proof of an agreement, while the latter requires proof of a specific mental state and an act.

In response, the state contends that the trial court properly instructed the jury because not requiring unanimity as to whether *Pinkerton* liability has been established is a logical extension of this court's decision in *State* v. *Correa*, 241 Conn. 322, 348, 696 A.2d 944 (1997), in which we rejected a defendant's claim that the state constitution requires a jury verdict to be unanimous as to whether it is predicated on a theory of either principal or accessorial liability. The state also contends that our decision in *State* v. *Walton*, 227 Conn. 32, 45–46, 630 A.2d 990 (1993), "strongly suggests that principal, accessorial, and *Pinkerton* liability are not conceptually distinct from one another, but are, in fact, different ways to commit the same crime," and that "[t]he line distinguishing accessory liability and *Pinkerton* liability is almost nonexistent . . . ." We agree with the defendant.

We begin with a review of the jury instructions at issue in the present case. After explaining the various bases for criminal liability, specifically principal, accessory or coconspirator liability under the *Pinkerton* doctrine, the trial court stated: "Principal, accessory, and

---

[15] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

coconspiratorial liability are merely different means of committing a single crime. *Therefore, you need not be unanimous in your verdict as to a theory of liability.* You must, however, be unanimous in your verdict that the defendant is guilty beyond a reasonable doubt or not guilty of the crime charged." (Emphasis added.) The trial court then instructed the jury in a like manner in the context of the specific offenses charged, stating, for example, in the context of the attempted murder charge: "If you find that the state has proven beyond a reasonable doubt that the defendant committed the crime of attempt to commit murder, either as a principal or as an accessory or as a coconspirator, you should find . . . the defendant guilty of attempt to commit murder. As I have said, a person is guilty of a crime either because he is a principal offender or he is an accessory or he is a coconspirator. An accessory or coconspirator is guilty just as if he were the principal offender. *It is not necessary, however, that you unanimously agree whether the defendant committed the crime of attempt to commit murder either as the principal or as an accessory or as a coconspirator.*

"In other words, you need not in your deliberations decide who fired the shot which injured [the victim]. Rather, the issue before you is whether the defendant is guilty of the crime of attempt to commit murder as charged either as [a] principal or as an accessory or as [a] coconspirator in accordance with these instructions. *You need not be unanimous as to any one theory of liability. You must, however, be unanimous as to whether the defendant is guilty beyond a reasonable doubt or not guilty of the crime charged.* If you unanimously find that the elements constituting the crime of attempt to commit murder, either as [a] principal or as an accessory or as a coconspirator, have been proven by the state beyond a reasonable doubt you should find the defendant guilty of the crime of attempt to commit

murder."[16] (Emphasis added.) The defendant properly preserved this instructional claim for appellate review by taking an exception at trial.[17] See, e.g., *State* v. *Ramos*, 261 Conn. 156, 171, 801 A.2d 788 (2002).

---

[16] With respect to the assault charges, the trial court similarly instructed the jury: "If you find the state has proven beyond a reasonable doubt that the defendant committed the crime of assault in the first degree, either as a principal or as an accessory or as a coconspirator, you shall find—you shall find the defendant guilty of the assault in the first degree. As I have said, a person is guilty of a crime either because he is a principal offender or he is an accessory or he is a coconspirator. An accessory or coconspirator is guilty just as if he were the principal offender. *It is not necessary, however, that you unanimously agree with whether the defendant committed the crime of assault in the first degree either as a principal or as an accessory or as a coconspirator.*

"In other words, you need not in your deliberation decide who fired the shot which injured [the victim]. . . .

"*You need not be unanimous as to any one theory of liability.* You must, however, be unanimous as [to] whether the defendant is guilty beyond a reasonable doubt or not guilty of the crime charged." (Emphasis added.)

The kidnapping instruction was similar as well: "As I have said, a person is guilty of a crime either because he is the principal offender or is an accessory or he is a coconspirator. An accessory or coconspirator is guilty just as if he were the principal offender. *It is not necessary, however, that you unanimously agree whether the defendant committed the crime of kidnapping in the first degree either as the principal or as an accessory or as a coconspirator.* In other words, you need not in jury deliberation decide who kidnapped [the victim]. Rather, the issue before you is whether the defendant is guilty of the crime of kidnapping in the first degree as charged either as a principal or as an accessory or as a coconspirator in accordance with these instructions.

"*You need not be unanimous as to any one theory of liability.* You must, however, be unanimous as to whether the defendant is guilty beyond a reasonable doubt or not guilty of the crime charged. If you unanimously find the elements of the crime of kidnapping in the first degree as principal or accessory or coconspirator has been proven by the state beyond a reasonable doubt, you shall find the defendant guilty of the crime of kidnapping in the first degree. If you find the defendant guilty you should next determine whether the state has proven beyond a reasonable doubt that the defendant used a firearm in the commission of the crime." (Emphasis added.)

The trial court subsequently reminded the jury more generally that, "[w]hen you reach a verdict it must be unanimous. That is, one with which you all agree."

[17] The defendant argued before the trial court that this court's decision in *State* v. *Coltherst*, 263 Conn. 478, 820 A.2d 1024 (2003), "does not support

In reviewing claims of instructional error, we seek to determine "whether it was . . . reasonably possible that the jury was misled by the trial court's instructions . . . [and] the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 195, 891 A.2d 897 (2006).

Moreover, in *State* v. *Famiglietti*, 219 Conn. 605, 619–20, 595 A.2d 306 (1991), we articulated the "multipartite test" for determining whether a specific unanimity charge is required "to be given in [a] case in which criminal liability may be premised on the violation of one of several alternative subsections of a statute. . . . We first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter. Even if the instructions at trial can be read to have sanctioned such a nonunanimous verdict, however, we will remand for a new trial only if (1) there is a conceptual distinction between the

the proposition that the court can instruct a lack of unanimity on those three different forms of liability." The trial court, however, agreed with the state's position that its charge was proper in light of this court's decision in *State* v. *Correa*, supra, 241 Conn. 322, and ruled that the instruction would remain as read because "coconspirator liability is a vicarious liability principle just like accessory liability and almost an oxymoron not to apply the same principle in the same manner as to accessory liability."

alternative acts with which the defendant has been charged, and (2) the state has presented evidence to support each alternative act with which the defendant has been charged."[18] See also, e.g., *State* v. *Dyson*, 238 Conn. 784, 793–94, 680 A.2d 1306 (1996) (applying *Fam-*

[18] The *Famiglietti* rule is derived from a series of Connecticut cases following the opinion of the United States Court of Appeals for the Fifth Circuit in *United States* v. *Gipson*, 553 F.2d 453, 458 (5th Cir. 1977), in which "the court held that the unanimity requirement requires the jury to agree on the factual basis for an offense if alternative acts charged are conceptually distinct and the state has presented supporting evidence on each alternative"; *State* v. *Tucker*, 226 Conn. 618, 645–46 n.34, 629 A.2d 1067 (1993); as well as the Fifth Circuit's subsequent decision in *United States* v. *Bolts*, 558 F.2d 316, 326 n.4 (5th Cir.), cert. denied sub nom. *Hicks* v. *United States*, 434 U.S. 930, 98 S. Ct. 417, 54 L. Ed. 2d 290 (1977), which limited the scope of *Gipson* to situations wherein the trial court expressly had sanctioned a nonunanimous verdict. *State* v. *Jennings*, 216 Conn. 647, 661–62, 583 A.2d 915 (1990).

We note that our continued adherence to the *Gipson* rule as formulated in *Famiglietti*, even in the limited circumstance wherein the trial court has in some way expressly sanctioned a nonunanimous verdict, is a minority position because most states follow the rule of *People* v. *Sullivan*, 173 N.Y. 122, 127, 65 N.E. 989 (1903), and require jury unanimity only with respect to the "ultimate issue" of guilt or innocence. See *Schad* v. *Arizona*, 501 U.S. 624, 641–42, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) (plurality opinion acknowledging *Sullivan* rule regarding jury unanimity); see also, e.g., *State* v. *James*, 698 P.2d 1161, 1165 (Alaska 1985) ("[w]e adopt the *Sullivan* rule for cases in which a jury is instructed disjunctively on alternative methods by which a defendant may commit a single offense"); *People* v. *Davis*, 8 Cal. App. 4th 28, 44, 10 Cal. Rptr. 2d 381 (1992) ("it is unnecessary jurors unanimously agree on the theory of criminal culpability supporting their unanimous 'conclusion of guilt' "); *People* v. *Hall*, 60 P.3d 728, 731 (Colo. App. 2002) ("[t]he jury was only required to reach a unanimous verdict on the charge of first degree murder, not as to the alternative theories offered in support of the charge"), cert. denied, 2003 Colo. LEXIS 6 (January 6, 2003); *State* v. *Klinge*, 92 Haw. 577, 589, 994 P.2d 509 (2000) (separate unanimity instruction not required when statute merely defines several different ways to commit one crime); *Taylor* v. *State*, 840 N.E.2d 324, 333 (Ind. 2006) ("while jury unanimity is required as to the defendant's guilt, it is not required as to the theory of the defendant's culpability"); *State* v. *Brown*, 138 N.J. 481, 522, 651 A.2d 19 (1994) ("[t]he jury's verdict that defendant was guilty of the purposeful and knowing murder of [two victims] required the jury to have determined that defendant was responsible for the murders beyond a reasonable doubt, either by his own conduct, as an accomplice, or as a co-conspirator, but did not require unanimity on the specific theory

*iglietti* and concluding that specific unanimity instruction not required with respect to alternate theories of accessory liability under § 53a-8 [a] because they are not "conceptually distinct," but rather are "slightly different characterizations that can be given the defendant's particular conduct, all of which make a defendant an accessory to a crime" [internal quotation marks omitted]); *State* v. *Tucker*, 226 Conn. 618, 647–49, 629 A.2d 1067 (1993) (applying *Famiglietti* to conclude unanimity instruction not required because threat of force and use of force are not conceptually distinct with respect to compelled sexual intercourse for purposes of sexual assault in first degree under General Statutes § 53a-70); *State* v. *Benite*, 6 Conn. App. 667, 675, 507 A.2d 478 (1986) ("[t]he determination of whether actions are conceptually distinct must be made with reference to the purpose behind the proposed charge: to ensure that the jurors are in unanimous agreement as to what conduct the defendant committed").

The trial court's instructions in the present case satisfy the threshold requirement under *Famiglietti*, namely, that the trial court included in its instructions language "expressly sanctioning" a nonunanimous ver-

of liability"), overruled on other grounds by *State* v. *Cooper*, 151 N.J. 326, 700 A.2d 306 (1997); *Holland* v. *State*, 91 Wis. 2d 134, 143, 280 N.W.2d 288 (1979) (jury need not need be unanimous about factual basis for conviction under "party to crime" statute rendering person liable for substantive crime if he is principal, coconspirator or accessory), cert. denied, 445 U.S. 931, 100 S. Ct. 1320, 63 L. Ed. 2d 764 (1980). But see *Liu* v. *State*, 628 A.2d 1376, 1386–87 (Del. 1993) (reaffirming requirement that, if factors exist in multitheory case that might create potential for jury confusion, state must prove at least one theory beyond reasonable doubt to unanimous jury); *Commonwealth* v. *Santos*, 440 Mass. 281, 287, 288, 290, 797 N.E.2d 1191 (2003) (noting that although "the court has adopted the requirement that the jury be unanimous as to the 'theory' of guilt when the Commonwealth has proceeded on 'alternate theories,'" different theories are "separate, distinct, and essentially unrelated ways in which the same crime can be committed," and court has "rejected the argument that the jury must be unanimous as to whether guilt is based on liability as a principal or as a joint venturer").

dict. See, e.g., *State* v. *Ceballos*, 266 Conn. 364, 419, 832 A.2d 14 (2003). Accordingly, we now seek to determine whether there is a "conceptual distinction between the alternative acts with which the defendant has been charged . . . ." *State* v. *Famiglietti*, supra, 219 Conn. 619–20. This analysis requires a review of the distinctions between the accessorial and coconspiratorial bases for vicarious criminal liability.

We turn, therefore, to *State* v. *Coltherst*, 263 Conn. 478, 491–93, 820 A.2d 1024 (2003), wherein we comprehensively discussed "our case law applying the *Pinkerton* doctrine. This court first explicitly adopted the *Pinkerton* principle of vicarious liability for purposes of our state criminal law in *State* v. *Walton*, [supra, 227 Conn. 32]. Under the *Pinkerton* doctrine, which, as of the date of our decision in *Walton*, was 'a recognized part of federal criminal conspiracy jurisprudence'; id., 43; 'a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy.' Id., citing *Pinkerton* v. *United States*, [328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)]. The rationale for the principle is that, when 'the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct.' *State* v. *Walton*, supra, 46.

"We concluded in *Walton* that the *Pinkerton* principle was applicable in state criminal cases, reasoning, 'first, that *Pinkerton* liability is not inconsistent with our penal code and, therefore, that we were not prohibited from recognizing that theory of criminal liability as a matter of state common law. See General Statutes § 53[a]-4. Without foreclosing the use of the *Pinkerton*

doctrine in other circumstances, we then concluded that application of the doctrine was appropriate in *Walton*, in which [1] the defendant was a leader of the conspiracy, [2] the offense for which vicarious liability was sought to be imposed was an object of the conspiracy and [3] the offense was proved by one or more of the overt acts alleged in support of the conspiracy charge. *State* v. *Walton*, supra, [227 Conn.] 44–46, 50–51.' *State* v. *Diaz*, [237 Conn. 518, 526–27, 679 A.2d 902 (1996)].

"In *State* v. *Diaz*, supra, 237 Conn. 518, we were required to 'decide whether to extend the principle of vicarious liability that we adopted in *Walton* to a case in which not all of [the three *Walton*] conditions have been met, a question that we expressly reserved in *Walton*.' Id., 527. In *Diaz*, the defendant had been convicted of, inter alia, murder under the *Pinkerton* doctrine and conspiracy to commit murder. Id., 519–20. The evidence showed that the defendant, along with several other individuals, had fired multiple gunshots into a motor vehicle occupied by the victim and three others. Id., 522–23 and n.7. The victim was struck and killed by a single bullet. Id., 523. The defendant claimed on appeal that the court's instruction under the *Pinkerton* doctrine had been improper because, among other reasons, it was broader than the limited version of the doctrine recognized in *Walton*. Id., 525–26. This court acknowledged that the state had not proved that the defendant was the leader of the conspiracy to ambush the vehicle and its occupants and, thus, had not established the first condition for *Pinkerton* liability set forth in *Walton*. Id., 529. We noted, however, that 'the evidence reasonably established that the defendant was a fully engaged member of the conspiracy who had actively participated in the shooting and that he, along with his coconspirators, intended to kill one or more of the vehicle's passengers.' Id. We concluded that

'where . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct.' Id. We further concluded that *'Pinkerton* liability may be imposed even if none of the three *Walton* conditions is present.' . . . Id., 527.

"We also acknowledged, however, that 'there may be *occasions when it would be unreasonable to hold a* defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. . . . For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate.' . . . Id., 530."

In *Coltherst,* we further extended the application of *Pinkerton* to a situation wherein the defendant himself did not have the level of intent required by the substantive offense for which he was charged, specifically, intentional murder. *State* v. *Coltherst,* supra, 263 Conn. 499–500. The defendant in that case had participated in a carjacking wherein he and a coconspirator kidnapped and robbed the victim. Id., 485. After the carjackers had pulled over to the side of the road and discharged the victim, one of the defendant's coconspirators shot the victim at point blank range while the defendant remained in the car. Id. We concluded that, "the *Pinkerton* doctrine constitutionally may be, and, as a matter

of state policy, should be, applied in cases in which the defendant did not have the level of intent required by the substantive offense with which he was charged. The rationale for the doctrine is to deter collective criminal agreement and to protect the public from its inherent dangers by holding conspirators responsible for the natural and probable—not just the intended—results of their conspiracy. . . . This court previously has recognized that [c]ombination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise. . . . In other words, one natural and probable result of a criminal conspiracy is the commission of originally unintended crimes. When the defendant has played a necessary part in setting in motion a discrete course of criminal conduct . . . he cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for the natural and probable results of that conduct that, although he did not intend, he should have foreseen. The defendant in this case makes no claim that the nexus between his involvement in the conspiracy and [the coconspirator's] murder of the victim was so attenuated or remote . . . that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator."[19] (Citations omitted; internal quotation marks omitted.) Id., 498–99. We further concluded that *Pinker-*

---

[19] In *Coltherst*, we also rejected the defendant's claim that "the application of *Pinkerton* under the facts of this case violates due process because it relieves the state of the burden of proving an element of the crime, namely, intent to kill." *State* v. *Coltherst*, supra, 263 Conn. 494. We noted that the "United States Supreme Court in *Pinkerton* itself acknowledged that *Pinkerton* rests on the same principles as those governing accessory liability, which allow conduct to be imputed to a defendant. Our research has uncovered no case in which any court has suggested that accessory liability offends due process. We fail to see, therefore, why the imputation of intent under *Pinkerton* would do so." Id.

*ton* liability could be the predicate for convictions of both intentional murder and capital felony. Id., 501–502.

In contrast, accessorial liability, although also vicarious in nature, differs from *Pinkerton* liability with respect to the mental state required. Unlike coconspirator liability under *Pinkerton*, which is predicated on an agreement to participate in the conspiracy, and requires the substantive offense to be a reasonably foreseeable product of that conspiracy; see, e.g., id., 491; accessorial liability pursuant to § 53a-8 requires the defendant to have the specific mental state required for the commission of the substantive crime. See General Statutes § 53a-8 (a) ("[a] person, *acting with the mental state required for commission of an offense,* who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender" [emphasis added]); see also, e.g., *State* v. *Peeler*, 271 Conn. 338, 435, 857 A.2d 808 (2004) (Rejecting the defendant's claim that accessorial liability under § 53a-8 may not be used to prove aggravating factors necessary for the imposition of the death penalty because "[b]y its express terms, the statute provides that a person may be prosecuted and punished as the principal without actually committing the offense himself. . . . [T]he defendant's proffered interpretation would vitiate one of the clearly stated, overarching purposes of the statute, i.e., the punishment of a person as if he were the principal, when, with the requisite mental state, he solicits, requests, commands, importunes or intentionally aids the person who physically committed the crime."), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). The overlapping mental state requirement is why, in *State* v. *Correa*, supra, 241 Conn. 348, we rejected the claim that, "the defendant has a right under the Connecticut constitu-

tion that the jury unanimously agrees on his liability as a principal or an accessory in his commission of a capital felony." In so concluding, we noted that "[s]uch a rule would lead to absurd results where, as here, the jury disagreed only about the defendant's exact role in the murders and there was ample evidence that he had intended the two victims to be killed. Our decision is, at its core, necessary and 'indispensable in a system that requires a unanimous jury verdict to convict.' " Id., quoting *Schad* v. *Arizona*, 501 U.S. 624, 651, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) (Scalia, J., concurring).

Our recent decision in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), is particularly instructive regarding the conceptual differences between *Pinkerton* and accessorial liability. In *Patterson*, we concluded that General Statutes § 53-202k,[20] which provides for a mandatory sentence enhancement as a consequence for the use or threatened use of a firearm in connection with the commission of a class A, B or C felony, does not permit the enhancement of a defendant's sentence solely on the basis that "one of the defendant's coconspirators had used a firearm during the commission of the offense . . . ."[21] Id., 474; see also id., 478 ("[w]e

[20] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[21] In *Patterson*, the state had conceded that the trial court failed to follow the proper procedure, outlined in *State* v. *Velasco*, 253 Conn. 210, 226–27, 751 A.2d 800 (2000), by enhancing the defendant's sentence pursuant to § 53-202k in the absence of a jury finding that the defendant had used a firearm during the commission of a felony. *State* v. *Patterson*, supra, 276 Conn. 477. The state argued, however, that this was harmless error because "the jury's finding of guilty on the charge of conspiracy to commit murder satisfies the requirement of § 53-202k that the defendant has committed a class A, B or C felony. With respect to the second requirement of § 53-202k, namely, that the defendant 'uses' a firearm during the commission of that

disagree with the state, however, that, for purposes of § 53-202k, the possession of a firearm by one coconspirator is attributable to other coconspirators"). In so concluding, we rejected the state's reliance on *State* v. *Davis*, 255 Conn. 782, 792–93, 772 A.2d 559 (2001), in which we concluded that "an unarmed accomplice to a class A, B or C felony may be found to have violated § 53-202k on the basis of his or her accomplice's use of a firearm." *State* v. *Patterson*, supra, 479. We rejected the state's argument that we should apply the doctrine of *Pinkerton* liability to extend the holding of *Davis* to unarmed coconspirators. Id., 479–80. We concluded that "[t]he state's claim fails because the rationale underlying our determination in *Davis* regarding vicarious accomplice liability for purposes of § 53-202k does not support the state's contention regarding vicarious coconspirator liability under § 53-202k." Id., 480.

We also rejected the state's reliance on "our observation in *State* v. *Coltherst*, [supra, 263 Conn. 494], that '*Pinkerton* rests on the same principles as those governing accessory liability, which allow conduct to be imputed to a defendant . . . .' " *State* v. *Patterson*, supra, 276 Conn. 482. We first concluded that, strictly construed in the defendant's favor, and based on the timing of the statute's enactment as juxtaposed with developing criminal case law, the legislature could not have contemplated that *Pinkerton* liability would apply to § 53-202k.[22] Id., 483. More significantly with respect

offense, the state asserts that the overwhelming and uncontested evidence established that at least one of the defendant's coconspirators used a firearm during the course of the conspiracy and, further, that a coconspirator's use of a firearm during the commission of a class A, B or C felony is attributable to any other coconspirator—in this case, the defendant—for purposes of § 53-202k." Id., 477–78.

[22] We noted that, "at the time § 53-202k was enacted in 1993 . . . the *Pinkerton* doctrine of vicarious liability was not well established in our state criminal law. Indeed, this court did not expressly adopt the *Pinkerton* doctrine for purposes of our state criminal law until 1993 . . . the very year that § 53-202k was enacted. Thus, unlike accessorial liability, which, as a common-law and statutory rule, was firmly rooted in this state's criminal

to the present case, we also stated that, "although it is true that the *Pinkerton* doctrine and accessory liability both are predicated on the concept of vicarious liability, there is a significant difference between the two principles. For example, accessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . . Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense. . . . By contrast, under the *Pinkerton* doctrine, a conspirator may be found guilty of a crime that he or she did not commit if the state can establish that a coconspirator did commit the crime and that the crime was within the scope of the conspiracy, in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy. . . . In view of the important difference between accessory liability and *Pinkerton* liability, we reject the state's contention that we should treat them similarly for the purpose of determining whether the legislature intended to incorporate the latter into § 53-202k." (Citations omitted; internal quotation marks omitted.) Id. We, therefore, vacated the sentence enhancement applied to the defendant in *Patterson*. Id., 484.

Our recent decision in *Patterson* makes abundantly clear that accessory liability and coconspiratorial liability, although both relate to vicarious liability principles generally, are conceptually distinct ways to commit a crime. With respect to the second prong of *Famiglietti*, namely, whether "the state has presented evidence to support each alternative act with which the defendant

jurisprudence prior to the enactment of § 53-202k, *Pinkerton* liability was not an acknowledged part of that body of law when § 53-202k was enacted. Consequently, there is no reason to presume that the legislature contemplated that the *Pinkerton* principle of vicarious liability would apply to § 53-202k." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 482–83.

has been charged"; *State* v. *Famiglietti*, supra, 219 Conn. 620; our review of the record indicates that it contains ample evidence to support conviction under any of the principal, accessory or coconspirator theories of liability.[23] Accordingly, the trial court should

---

[23] The state contends that it has proven beyond a reasonable doubt that the instructional impropriety was harmless error because the record contains ample evidence to support a conviction under any of the three theories of criminal liability. This argument is, at first glance, appealing both on the factual record of this case and in the context of our more general harmless error jurisprudence. It is, however, inconsistent with the approach that we follow in the limited context of *State* v. *Famiglietti*, supra, 219 Conn. 619–20, which states specifically that, "if the instructions at trial can be read to have sanctioned such a nonunanimous verdict . . . we *will remand for a new trial only if* (1) there is a conceptual distinction between the alternative acts with which the defendant has been charged, *and* (2) the state has presented evidence to support each alternative act with which the defendant has been charged." (Emphasis added.) This well established formulation does not, therefore, contemplate a harmless error analysis if both prongs are satisfied.

Indeed, the second prong of *Famiglietti* is reflective of prior decisions finding harmless error with respect to improper unanimity instructions if the evidence on the record supported a finding that the defendant had committed only one of the alternative acts charged, because that would eliminate the potential for jury confusion or disagreement as to what the defendant actually did. For example, in *State* v. *Mancinone*, 15 Conn. App. 251, 277, 278–79, 545 A.2d 1131 (1988), cert. denied, 209 Conn. 818, 551 A.2d 757, cert. denied, 489 U.S. 1017, 109 S. Ct. 1132, 103 L. Ed. 2d 194 (1989), a risk of injury case based on allegations that the defendant had given teenage girls alcohol and marijuana, and had engaged in sexual conduct with them, "any error committed by the court in neglecting to give a specific unanimity instruction was rendered harmless by the jury's verdict" that acquitted the defendant on all other charged sexual assault counts, which meant that "we can only conclude that the jury's verdict on the two counts of risk of injury must have been based, not on the evidence of sexual activity, but on the evidence of providing the victims with alcohol and marijuana. Under these circumstances, therefore, the risk of lack of jury unanimity . . . did not materialize." See also *State* v. *Edwards*, 10 Conn. App. 503, 513–14, 524 A.2d 648 (concluding that two types of conduct leading to liability under burglary statute, namely, "unlawfully remaining" or "unlawfully entering," are "conceptually different," but that failure to give specific unanimity instruction was harmless error because there was "no evidence introduced by either the state or the defendant, that the defendant had lawfully entered the [victim's] home, yet unlawfully remained"), cert. denied, 204 Conn. 808, 528 A.2d 1155 (1987).

Thus, without actually saying so, the state appears to be asking us to overrule this aspect of *State* v. *Famiglietti*, supra, 219 Conn. 619–20, in favor of a variant of the rule followed in Colorado, which is that, "the jury could return a general verdict of guilty on a single count alleged to have

not have given the jury an instruction that expressly sanctioned a nonunanimous verdict on conceptually distinct theories of liability in violation of the rule of *State* v. *Famiglietti*, supra, 619–20. Accordingly, the defendant is entitled to a new trial on the attempted murder, assault and kidnapping charges.[24]

The judgment is reversed in part and the case is remanded for a new trial on the attempted murder, assault and kidnapping charges; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

occurred under alternative theories without depriving the defendant of the right to a unanimous verdict. However, each theory presented had to be supported by sufficient evidence. If there were insufficient evidence of any alternative theory, the general verdict had to be set aside." *People* v. *Hall*, 60 P.3d 728, 733 (Colo. App. 2003). The harmless error analysis applied in *Hall* is, however, inapposite here because, unlike Connecticut; see footnote 18 of this opinion; Colorado follows the majority rule of *People* v. *Sullivan*, 173 N.Y. 122, 127, 65 N.E. 989 (1903), under which jury unanimity is required only with respect to the "ultimate issue" of guilt or innocence. See *People* v. *Hall*, supra, 731 ("[t]he jury was only required to reach a unanimous verdict on the charge of first degree murder, not as to the alternative theories offered in support of the charge"). In the absence of an explicit request, accompanied by adequate briefing demonstrating a compelling reason to do so, stare decisis demands that we leave the *Famiglietti* rule undisturbed. See, e.g., *Waterbury* v. *Washington*, 260 Conn. 506, 538, 800 A.2d 1102 (2002) ("[t]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it" [internal quotation marks omitted]).

[24] We note that the defendant does not raise a separate claim on appeal with respect to the adequacy of the trial court's instruction on the conspiracy to commit murder charge. Accordingly, we need not disturb that aspect of the judgment of conviction.