# STATE OF CONNECTICUT *v.* KEENAN CORLEY
## (AC 27647)

Flynn, C. J., and Lavine and Beach, Js.

Argued January 8—officially released April 1, 2008

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *C. Robert Satti, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Keenan Corley, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), assault in the first degree in violation of General Statutes § 53a-59 (a) (5), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the court improperly (1) denied him the right to a unanimous jury verdict on the charge of robbery in the first degree by instructing the jury on three distinct theories of criminal liability and (2) rejected his offers of proof on third party culpability.[1] The state concedes that the defendant is entitled to a new trial on the charge of robbery in the first degree because the court improperly charged the jury on various theories of criminal liability related to that charge.[2] We agree with the

[1] The defendant specifically withdrew his remaining claims at oral argument, thus permitting us to concentrate on his well argued and strongest appellate issues.

[2] At oral argument, supervisory assistant state's attorney Frederick W. Fawcett explained that our Supreme Court in *State* v. *Martinez*, 278 Conn. 598, 900 A.2d 485 (2006), which was decided after the trial of the defendant in the present case, held that it is improper for a trial court to give the jury an instruction that expressly sanctions a nonunanimous verdict on conceptually distinct theories of liability. He concedes that the instruction in this case virtually was identical to the instruction in *Martinez*.

parties that the conviction of robbery in the first degree must be reversed and a new trial ordered on that count, but we disagree with the defendant's remaining claim. We therefore affirm in part and reverse in part the judgment of the trial court.

The following facts are relevant to our resolution of the defendant's claims on appeal. On the night of April 23, 2004, Wilson Morel was working in the Guayama Market in Bridgeport, which was owned by his brother, when two masked men entered the market. Both men were wearing black clothing. One of the men, whose voice Morel recognized as being the defendant's, put a gun to Morel's head and demanded that he not move. The defendant instructed Morel to turn over everything that he had in his pants pockets. Morel did not comply, and the defendant removed a chain from Morel's neck. The second man took approximately $800 from the store cash register, and both men ran from the store. Another employee, Elizer Meran, attempted to grab one of the men, but he was unsuccessful. Carlos Soler, a customer in the store at the time of the robbery, saw both men leave the store, and both he and Meran attempted to chase the men. They both saw these men enter a black Acura Integra with a "for sale" sign affixed to it. Meran was able to see part of the license plate, which included the numbers 204. Soler also saw Lius Lainez sitting in a parked car outside of the market, and he told Lainez that the market had just been robbed. Lainez attempted to drive in front of the Acura. The

---

Attorney Fawcett, who argued the *Martinez* case before the Supreme Court, very eloquently informed us that as he was arguing that case on behalf of the state, "[he] saw that cloud of defeat come over [him] as [he] looked up at the ceiling and saw that . . . beautiful painting up there, sort of, covered by that cloud of defeat. Which does happen occasionally." We take this time to commend the state for being forthright with regard to this issue. Its concession serves the ends of justice and obviates the need for this court to address at length this claim in which the decision of our highest court must guide us.

defendant removed his mask and fired two to three gunshots. One of the bullets went through the windshield of Lainez' automobile and struck Lainez in his left shoulder. The defendant and the other robber then drove away from the scene.

After an investigation, the police arrested the defendant, and he was charged with two counts of robbery in the first degree in violation of § 53a-134 (a) (2), two counts of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1), and one count of assault in the first degree in violation of § 53a-59 (a) (5), one count of conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (2) and one count of carrying a pistol without a permit in violation of § 29-35 (a). Following a trial by jury, the defendant was convicted of one count each of robbery in the first degree, assault in the first degree, conspiracy to commit robbery in the first degree and carrying a pistol without a permit. The court sentenced the defendant to a total effective sentence of twenty years imprisonment, with five years of special parole. This appeal followed.

I

The defendant claims that the court's instructions regarding robbery in the first degree allowed for a non-unanimous verdict in that the court instructed the jury that he could be found guilty of robbery in the first degree either as a principal, as an accessory or as a coconspirator. The state concedes that the defendant is entitled to prevail on his claim because the court's instruction in this case virtually was identical to the instruction found improper by our Supreme Court in *State* v. *Martinez*, 278 Conn. 598, 900 A.2d 485 (2006), which held that "accessory liability and coconspiratorial liability, although both relat[ed] to vicarious liability principles generally, are conceptually distinct ways

to commit a crime." Id., 618. We conclude that *Martinez* governs this situation and that further discussion of our Supreme Court's clear holding would simply "gild the lily" and would serve no useful purpose here. Cf. *State v. Samuel*, 94 Conn. App. 715, 721, 894 A.2d 363, cert. denied, 278 Conn. 911, 899 A.2d 39 (2006). Accordingly, the defendant's conviction of robbery in the first degree must be reversed and a new trial ordered on that charge.

## II

The defendant next claims that he is entitled to a new trial on all charges because the court violated his right to put on a defense when it improperly rejected his offers of proof demonstrating third party culpability. The defendant argues that the testimony about third party culpability that he sought to introduce, although highly circumstantial in nature, was not speculative and, therefore, should have been admitted. We disagree.

We first set forth the standards governing the admissibility of third party culpability evidence. "It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused. . . . The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence

establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt." (Citations omitted; internal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 609–10, 935 A.2d 975 (2007).

Out of the presence of the jury, as to his offer of proof on his third party culpability claim, the defendant presented to the court the testimony of two individuals, Hafi Edge and David Hackney. Edge testified that in April or May, 2004, he, Hackney and two female friends were in Edge's apartment at approximately 10:30 p.m. when Iroquois Alston and another male, whom Edge did not know, entered the apartment carrying a bag full of Bacardi rum bottles. Edge asked Alston where he had gotten so much rum, and Alston responded that they had just done a "jux."[3] Alston was wearing a black do-rag and a black Mecca hoodie, and the other male was wearing a red do-rag and a red Mecca hoodie. Edge described Alston as a dark black male, between five

---

[3] Edge explained that a "jux" is a street term for robbery.

feet, eight inches tall and five feet, nine inches tall, stocky with shoulder length dreadlocks, a beard and a mustache. He described the other male as dark, approximately six feet tall, with short twists or braids in his hair.

Approximately one hour after Alston and the other male arrived, the defendant also arrived at Edge's apartment. He was driving his old, green automobile, with the number "88" on the side of it. After visiting for a while, Alston and the other male left the apartment, asking Edge if it was okay for them to leave behind their hoodies, to which Edge responded affirmatively. They also left without taking the automobile in which they had arrived, a black Acura, owned by someone known as "Pretty Rick." Edge also stated that the last he knew, Alston was in jail for some other crime.[4] Hackney testified that he was at Edge's apartment when Alston and another male, whom Hackney did not know, arrived one night "last year" and that Alston and the other male left their hoodies behind at Edge's apartment when they left that evening.

The defendant argues that he "attempted to introduce the evidence that on the evening in question, two individuals arrived at Edge's apartment carrying a bag of Bacardi rum, the two individuals matched the description given by one of the witnesses at the Guayama Market, both individuals were wearing similar clothing to that described by the witnesses at the market and the two individuals were driving the same make, model and color of the vehicle used by the individuals to rob

---

[4] Edge also testified that a couple of weeks later, Alston admitted to him that he and the other male, who had gone to Edge's apartment, were responsible for the crimes for which the defendant had been charged and that Alston was trying to raise some money to pay the defendant's bond. The defendant concedes that the statements allegedly made to Edge by Alston would not have been admissible, as they are hearsay. He therefore makes no claim related to this portion of Edge's testimony.

the market. The excluded evidence deprived the defendant of the benefit of a 'pro defense' inference suggesting that he was not guilty as charged." He further argues that "Edge's testimony, and to a lesser degree Hackney's testimony, clearly connected Alston and his companion to the crime with sufficient directness to satisfy the rules of relevancy." We disagree.

In assessing the defendant's offer of proof, although rejecting it primarily on the ground that Edge's testimony was not admissible as a declaration against the penal interests of the declarant, the court also stated in relevant part: "According to the witness, Mr. Edge, [Alston] wanted to celebrate a recent robbery with a bottle of Bacardi. Also, according to the witness, Mr. Edge, the defendant . . . later joined the group at [Edge's] apartment. [Alston] and the second person asked to leave their hoodies at the apartment. [Alston] allegedly . . . drove a black Acura owned by Rick to the apartment . . . . There was no date given for this meeting, only April or May. There was no evidence that it was a Guayama Market. The date is uncertain and the venue is unidentifiable . . . ." The court also held in relation to Hackney's testimony that it did not "see any relevance to [the testimony] as far as the culpability of third parties is concerned. [The testimony] does not even really . . . raise itself to the level of mere suspicion." We agree that this offer of proof merely was speculative, and, therefore, the evidence was inadmissible.

Although evidence of a strong physical resemblance between the defendant and a third party, whom the defendant alleges to be responsible for the crimes with which the defendant has been charged, can be highly relevant; see *State* v. *Echols*, 203 Conn. 385, 394, 524 A.2d 1143 (1987); a defendant proposing such third party culpability evidence must demonstrate that the evidence is corroborative rather than merely coincidental for it to be admissible. See *State* v. *Baker*, 50 Conn.

App. 268, 279, 718 A.2d 450 ("[u]nless [a] direct connec-
tion exists it is within the sound discretion of the trial
court to refuse to admit such evidence when it simply
affords a possible ground of possible suspicion against
another person" [internal quotation marks omitted]),
cert. denied, 247 Conn. 937, 722 A.2d 1216 (1998).

Here, although the proposed evidence may have
shown that Alston bore a physical resemblance to the
defendant, there was no evidence that Alston and the
other male were involved in the events that took place
at the Guayama Market on the night of April 23, 2004.
Edge had little recollection of the date that Alston and
the other male came to his home with the full bag
containing bottles of rum other than that it was, "like,
between April or May, not later." Edge also testified on
cross-examination, however, that "[i]t was hot outside
. . . where you didn't have to wear no hoodies and
sweaters." Hackney merely stated that it was some time
"last year." As for the black Acura, Edge testified that
Alston and the other male arrived in that vehicle and
left it there for "[e]xactly" three days.[5]

---

[5] We also note that at trial, Officer Clive Higgins of the Bridgeport police
department testified that a black Acura, bearing license plate number 204TAV
was parked at 102 Horace Street in Bridgeport the day after the robbery.
Inside this vehicle was a for sale sign bearing a telephone number and the
name Ricky. The defendant also went to 102 Horace Street the day after
the robbery. Officer Jason Amato, also of the Bridgeport police department,
testified that he remembered seeing this Acura three times and that every
time he saw it, the defendant had been a passenger in it. Amato also remem-
bered that the last two times he saw the Acura, there was a for sale sign
on it.

In this case, there also were two eyewitnesses. Morel, who was familiar
with the defendant, testified that although he could not see the robbers'
faces, he recognized the defendant's voice. He also testified that both robbers
were wearing black hoodies. Lainez testified that although he initially
declined to identify the defendant from a photographic array and told the
police that he could not identify the suspects, he did so "because [he] didn't
want any problems." Lainez further testified that he, in fact, did know who
the suspect was. He then identified the defendant as one of the suspects.
He also testified that both men were wearing black hoodies.

We conclude that the evidence proffered by the defendant in support of his third party culpability claim did nothing more than raise a mere suspicion that Alston and the other male might have been involved. The defendant failed to provide a direct connection between these men and the commission of the charged crimes. "Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination." *State* v. *Arroyo,* supra, 284 Conn. 610. Accordingly, we conclude that the court did not abuse its discretion in excluding the proffered evidence.

The judgment is reversed as to the conviction of robbery in the first degree and the case is remanded for a new trial on that charge. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.