STATE OF CONNECTICUT *v.* ANTHONY COWARD
(SC 17706)

Rogers, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued February 13—officially released June 30, 2009

*Lauren Weisfeld,* assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, *Dennis J. O'Connor,* senior assistant state's

attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Anthony Coward, appeals[1] directly from the judgment of the trial court, rendered after a jury trial, convicting him of two counts of felony murder in violation of General Statutes § 53a-54c and one count each of murder in violation of General Statutes § 53a-54a (a),[2] manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3),[3] robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a)[4] and 53a-134 (a) (2),[5]

---

[1] The defendant appeals directly to this court from the judgment of the trial court pursuant to General Statutes § 51-199 (b) (3).

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight

and conspiracy to commit burglary in the first degree in violation of §§ 53a-48 (a) and 53a-101 (a) (1). On appeal, the defendant claims that: (1) we should vacate his conviction for manslaughter in the first degree because reckless manslaughter predicated on criminal liability under the doctrine set forth in *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946),[6] is not a cognizable crime under Connecticut law; (2) the trial court improperly instructed the jury on the concept of consciousness of guilt; and (3) the trial court improperly instructed the jury on the applicable reasonable doubt standard. We affirm the judgment of the trial court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural history. On the evening of December 3, 2002, the defendant, Keith Taylor and Maurice Lawrence met in New Haven to discuss a plan to rob Wahied Jerjies, a drug dealer with whom Taylor had had prior dealings. Taylor, who owed an outstanding drug debt to Jerjies, was aware that Jerjies regularly kept large sums of money in his apartment, and suggested that the three men drive to that apartment to rob him.

After discussing the idea in New Haven, the three men subsequently drove to the Mill Pond Village housing complex in East Windsor, where Jerjies lived with his wife, Sara Sedor, and Sedor's daughter. Lawrence, who

---

therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[6] In *Pinkerton* v. *United States*, supra, 328 U.S. 647–48, the United States Supreme Court concluded that a conspirator may be held vicariously liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. We consistently have recognized *Pinkerton* liability as an established aspect of our criminal conspiracy jurisprudence. See, e.g., *State* v. *Martin*, 285 Conn. 135, 158, 939 A.2d 524, cert. denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101 (2008); *State* v. *Martinez*, 278 Conn. 598, 611, 900 A.2d 485 (2006).

previously had lived in that same complex, directed the other men to his unoccupied former apartment, where they further discussed their plan to rob Jerjies. During those discussions, Taylor left to retrieve a shotgun from his girlfriend's apartment, which also was located in the Mill Pond Village complex. When he returned, Taylor described the plan for the robbery to the others, explaining that Lawrence would serve as a lookout, while Taylor and the defendant would go inside Jerjies' apartment and "use force" to take what they wanted. Taylor directed the defendant to bring a baseball bat that Lawrence had produced from his apartment, while Taylor would use the shotgun that he had obtained. Taylor indicated to the others that the shotgun had only one shot, that he was going to use it if necessary and that people could get hurt if Jerjies or Sedor resisted.

Thereafter, the three men went to Jerjies' apartment, where they were met at the door by a woman who indicated that Jerjies was not home. They decided to wait for Jerjies nearby and, after Jerjies returned, Taylor and the defendant went to the front door of Jerjies' apartment while Lawrence hid by bushes located at the side of the apartment. When Jerjies answered the door, Taylor pointed the shotgun at Jerjies' chest and forced his way into the apartment. After following Taylor inside, the defendant encountered Sedor in the living room, at which point he began swinging his baseball bat at her in order to keep her away from him.

Subsequently, Taylor directed Lawrence to search the apartment for valuables, and also directed the defendant to grab Jerjies' Sony PlayStation II video game system. After Lawrence found a bag of marijuana, the defendant and Lawrence ran from the apartment through a rear screen door and, as they fled back to Taylor's car, they heard a gunshot ring out from inside the apartment. Lawrence and the defendant returned to Taylor's car and, approximately twenty minutes later,

Taylor returned to the car with a "splatter of blood on his clothes." Taylor indicated that he had dumped the shotgun in a nearby sewer, and that he had left the baseball bat in the apartment. Thereafter, the three men drove back to New Haven to drop off the defendant, who left the car in possession of the Sony PlayStation II, some marijuana and $200 in cash from the robbery.[7]

After receiving a telephone call from one of Jerjies' neighbors the next day, Jeffrey Capen, an East Windsor police officer, responded to the crime scene and found both Jerjies and Sedor dead in the apartment. Investigators discovered the baseball bat in the apartment, but subsequent testing did not reveal any trace of human blood on the bat. Investigators also discovered various broken pieces of the shotgun near Sedor's body, including two wooden pieces of the shotgun fore-ends, a metal spring and a U-shaped piece of metal that was entangled in Sedor's hair. Investigators also subsequently located the wooden stock and barrel of the shotgun, which bore

---

[7] The defendant disputed certain aspects of this version of events at trial through the submission of a written declaration given to the police. In that declaration, the defendant stated that, although Taylor had mentioned the possibility of stealing a car that night, the defendant was not aware from whom the car would be stolen or how it would be stolen. The defendant further stated that, during the time in which the three men were waiting in Lawrence's apartment for Jerjies to return, they did not discuss a plan to rob Jerjies, but simply engaged in general conversation. The defendant stated that Taylor and Lawrence had left in the middle of that conversation for about twenty minutes and that the defendant did not know where they went or what they were doing, but that he was aware that Taylor's girlfriend and child lived in that same housing complex. When Taylor and Lawrence returned, the defendant stated that the three of them went to Jerjies' apartment, where they were let in voluntarily. According to the defendant, once inside the apartment, Taylor pulled out a concealed shotgun from his jacket and began yelling and asking Jerjies where the marijuana was. The defendant also stated that Lawrence—and not the defendant—produced the aluminum baseball bat from inside his jacket, and that that was the first time that the defendant became aware of the existence of either weapon. The defendant further averred that Taylor took the bat from Lawrence and hit Sedor over the head with it.

traces of human blood, in the sewer in which Taylor had discarded it. Edward Jachimowicz, a state firearms examiner, testified that it would have taken "a tremendous amount of force" to break the shotgun apart in such a manner. Autopsies subsequently revealed that Jerjies had died from a shotgun wound to his neck that "obliterated . . . [it] from its normal anatomic function," and that Sedor had succumbed to extensive blunt force trauma to her head.

Taylor and Lawrence subsequently were arrested in connection with the murders, and the defendant surrendered voluntarily. The state charged the defendant with capital felony in violation of General Statutes §§ 53a-54b (7) and 53a-8 (a), two counts of murder in violation of § 53a-54a (a), two counts of felony murder in violation of § 53a-54c, robbery in the first degree in violation of § 53a-134 (a) (2), burglary in the first degree in violation of § 53a-101 (a) (1), conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (2), and conspiracy to commit burglary in the first degree in violation of §§ 53a-48 (a) and 53a-101 (a) (1). The defendant was tried before a jury, which returned a verdict convicting him of all charges except for the capital felony count and the murder count in connection with Sedor's death. The defendant was, however, convicted of the uncharged lesser included offense of manslaughter in the first degree in connection with Sedor's death. The trial court sentenced the defendant to a total effective sentence of sixty years imprisonment. This direct appeal followed.

On appeal, the defendant claims that: (1) we should vacate his conviction of manslaughter in the first degree because reckless manslaughter predicated on *Pinkerton* liability is not a cognizable crime under Connecticut law; (2) the trial court improperly instructed the jury on the concept of consciousness of guilt in a manner that bolstered the state's case, thereby denying the

defendant the right to a fair trial; and (3) the trial court's instruction on the applicable reasonable doubt standard violated his right to due process of law by diluting the state's burden of proof. We address each claim in turn.

I

The defendant first claims that his conviction of manslaughter in the first degree should be vacated because that offense, when predicated on *Pinkerton* liability, is not a cognizable crime under Connecticut law. The following additional facts and procedural history are relevant to our resolution of this claim. Count three of the information originally charged the defendant with the murder of Sedor on a theory of accessorial liability pursuant to §§ 53a-54a (a) and 53a-8 (a).[8] Prior to submitting the case to the jury, however, the state abandoned its theory of accessorial liability under § 53a-8 (a) in favor of a theory premised exclusively on vicarious liability under *Pinkerton* v. *United States*, supra, 328 U.S. 640.[9] The defendant was aware of this change in the

---

[8] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[9] "[A]lthough . . . the *Pinkerton* doctrine and accessory liability both are predicated on the concept of vicarious liability, there is a significant difference between the two principles. For example . . . under the *Pinkerton* doctrine, a conspirator may be found guilty of a crime that he or she did *not* commit if the state can establish that a coconspirator *did* commit the crime and that the crime was within the scope of the conspiracy, in furtherance of the conspiracy, and a reasonably foreseeable consequence of the conspiracy." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 483, 886 A.2d 777 (2005). "In contrast, accessorial liability, although also vicarious in nature, differs from *Pinkerton* liability with respect to the mental state required. Unlike coconspirator liability under *Pinkerton*, which is predicated on an agreement to participate in the conspiracy, and requires the substantive offense to be a reasonably foreseeable product of that conspiracy . . . accessorial liability pursuant to § 53a-8 requires the defendant to have the specific mental state required for the commission of the substantive crime." (Citation omitted.) *State* v. *Martinez*, 278 Conn. 598, 615, 900 A.2d 485 (2006).

state's theory of the case. Nevertheless, the defendant submitted a written request to charge to the trial court, expressly requesting that the court instruct the jury on the lesser included offense of manslaughter in the first degree with respect to Sedor's death. The trial court engaged in an on the record review of both the state's new theory of the case and the defendant's request to charge prior to instructing the jury on either issue, and the defendant did not raise any objection at that time, nor did he express any concern that his requested charge potentially conflicted with the theory of *Pinkerton* liability upon which the state was now relying.[10] Accordingly, the trial court instructed the jury on both issues. The jury subsequently acquitted the defendant of the charge of murder with respect to Sedor's death, but convicted him of the lesser included offense of manslaughter in the first degree. This appeal followed.

The defendant concedes on appeal that the present claim was not preserved at trial, but nevertheless seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[11] and the plain error doctrine. See Practice Book § 60-5. We conclude that the defendant's

---

[10] The defendant filed a motion for a judgment of acquittal prior to the submission of the case to the jury and a second motion after the verdict was returned, both of which claimed that the nexus between the defendant's role in the conspiracy and the deaths of the victims was too attenuated to warrant the imposition of *Pinkerton* liability. Neither motion, however, raised or discussed the issue of whether, as a matter of law, *Pinkerton* liability is unavailable in cases involving the reckless or unintended acts of a coconspirator.

[11] We concluded in *State* v. *Golding*, supra, 213 Conn. 239–40, "that a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

claim is not reviewable under *Golding* and that the trial
court did not commit plain error.

A

With respect to *Golding* review, the defendant con-
cedes that he induced[12] the claimed error by requesting
the very jury charge that he now claims was improper.[13]
The defendant also acknowledges, as he must, that we
have refused to review claims of induced error under
*Golding* regardless of whether those claims are of con-
stitutional magnitude. See *State* v. *Cruz*, 269 Conn. 97,
106, 848 A.2d 445 (2004). Although the defendant sum-
marily asks us to overrule prior case law as improperly

[12] "[T]he term induced error, or invited error, has been defined as [a]n
error that a party cannot complain of on appeal because the party, through
conduct, encouraged or prompted the trial court to make the erroneous
ruling. . . . It is well established that a party who induces an error cannot
be heard to later complain about that error. . . . This principle bars appel-
late review of induced nonconstitutional error and induced constitutional
error." (Internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116,
126 n.13, 951 A.2d 531 (2008).

[13] The defendant attempts to draw a distinction between the claimed error
in the trial court's instruction on manslaughter in the first degree, which
the defendant concedes he induced, and the court's instruction on vicarious
liability, in which the court did not limit its instruction to the crime of
"murder," but stated that the defendant could be held vicariously liable for
all reasonably foreseeable "criminal acts," "homicides" and "taking of human
lives" committed by a coconspirator in furtherance of the conspiracy, an
error that the defendant contends he did not induce. We conclude that the
distinction is one without a difference. The very premise of *Pinkerton* liabil-
ity is to extend criminal liability to the reasonably foreseeable "criminal
acts" committed in furtherance of the conspiracy, which acts, under the
facts of the present case, necessarily include the various types of criminal
"homicide" and criminal "taking of human lives." The only ground on which
the defendant could assert that the trial court's vicarious liability instruction
was improper, therefore, is that *Pinkerton* liability, as a matter of law, is
inconsistent with the specific crime of reckless manslaughter, as opposed
to the other kinds of criminal homicide. Indeed, that appears to be the
precise argument on which the defendant relies. See footnote 15 of this
opinion. Accordingly, because the defendant requested the very instruction
that would serve as the only potential basis for a finding of instructional
error on the issue of vicarious liability, we conclude that, if there was an
impropriety, it was induced by the defendant.

decided,[14] he has provided us with no reason to deviate from that practice in the circumstances of the present case. Accordingly, we decline to review the defendant's claim under *Golding*.

## B

The defendant also claims that his conviction of manslaughter in the first degree should be reversed under the plain error doctrine. The plain error doctrine, "codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy." (Internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009). The plain error doctrine, however, "is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings . . . [and] is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) Id.

In *State* v. *Myers*, supra, 290 Conn. 287–88, we recently clarified the two step framework under which

[14] The defendant asserts that previous cases in which we have concluded that *Golding* review is unavailable for claims of induced error were improperly decided, and should be reconsidered. The defendant, however, has not cited to any case law in support of such a conclusion, nor has he provided any independent analysis to buttress his claim. Accordingly, we decline to review this aspect of the defendant's claim as inadequately briefed. See, e.g., *Taylor* v. *Mucci*, 288 Conn. 379, 383 n.4, 952 A.2d 776 (2008).

we review claims of plain error. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was "indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of *not debatable*." (Emphasis added; internal quotation marks omitted.) Id., 287. We made clear in *Myers* that this inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal. See id.

In addition, although a clear and obvious mistake on the part of the trial court is a prerequisite for reversal under the plain error doctrine, such a finding is not, without more, sufficient to warrant the application of the doctrine. Because "[a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice"; (internal quotation marks omitted) id., 288; under the second prong of the analysis we must determine whether the consequences of the error are so grievous as to be fundamentally unfair or manifestly unjust. Id. Only if both prongs of the analysis are satisfied can the appealing party obtain relief. Id. We conclude that there was no plain error.

"Under the *Pinkerton* doctrine . . . a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. . . . The rationale for the principle is that, when the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits,

for the crimes committed as a natural and probable result of that course of conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 491, 820 A.2d 1024 (2003). "[W]here . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct." *State* v. *Diaz*, 237 Conn. 518, 529, 679 A.2d 902 (1996).

In analyzing vicarious liability under the *Pinkerton* doctrine, we have stated that "the *Pinkerton* doctrine constitutionally may be, and, as a matter of state policy, should be, applied in cases in which the defendant did not have the level of intent required by the substantive offense with which he was charged. The rationale for the doctrine is to deter collective criminal agreement and to protect the public from its inherent dangers by holding conspirators responsible for the natural and probable—not just the intended—results of their conspiracy. . . . This court previously has recognized that [c]ombination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise. . . . In other words, one natural and probable result of a criminal conspiracy is the commission of originally unintended crimes." (Citations omitted; internal quotation marks omitted.) *State* v. *Coltherst*, supra, 263 Conn. 498–99. Indeed, we specifically have contrasted *Pinkerton* liability, "which is predicated on an agreement to participate in the conspiracy, and requires the substantive offense to be a reasonably foreseeable product of that conspiracy"; *State* v. *Martinez*, 278 Conn. 598, 615,

900 A.2d 485 (2006); with accessorial liability, which "requires the defendant to have the specific mental state required for the commission of the substantive crime." Id.

Thus, the focus in determining whether a defendant is liable under the *Pinkerton* doctrine is whether the coconspirator's commission of the subsequent crime was *reasonably foreseeable*, and not whether the defendant could or did *intend* for that particular crime to be committed. In other words, the only mental states that are relevant with respect to *Pinkerton* liability are that of the defendant in relation to the conspiracy itself, and that of the coconspirator in relation to the offense charged. If the state can prove that the *coconspirator's* conduct and mental state satisfied each of the elements of the subsequent crime at the time that the crime was committed, then the defendant may be held liable for the commission of that crime under the *Pinkerton* doctrine if it was reasonably foreseeable that the coconspirator would commit that crime within the scope of and in furtherance of the conspiracy. See *State* v. *Coltherst*, supra, 263 Conn. 491.

We also have concluded, however, that "there may be occasions when it would be unreasonable to hold a defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. . . . For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate." (Citation omitted.) *State* v. *Diaz*, supra, 237 Conn. 530.

1

In support of his claim that the trial court's *Pinkerton* instruction constituted plain error, the defendant first contends that reckless manslaughter predicated on *Pinkerton* liability is not a cognizable crime in Connecticut because, as a matter of law, a defendant cannot be held vicariously liable for the reckless, and therefore unintended, acts of a coconspirator. Although the defendant does not cite to any case law discussing the application of *Pinkerton* liability to crimes involving a coconspirator's reckless conduct, he relies primarily on *State* v. *Beccia*, 199 Conn. 1, 5, 505 A.2d 683 (1986), and *State* v. *Almeda*, 189 Conn. 303, 309, 455 A.2d 1326 (1983), on appeal after remand, 196 Conn. 507, 493 A.2d 890 (1985), to claim that, because one cannot conspire to commit a substantive crime requiring an unintended result, as it is logically impossible to agree to achieve a specific result unintentionally, it could not, as a matter of law, have been a reasonably foreseeable consequence of the conspiracy in the present case that Taylor would kill Sedor in a reckless and unintentional manner.[15] Put differently, the defendant appears to contend that a reckless crime can never be reasonably foreseeable because it is logically impossible to intend an unintended result.

---

[15] In connection with this argument, the defendant further contends that, although the trial court properly instructed the jury that it could convict the defendant for the reasonably foreseeable "murders" committed by one of his coconspirators, the trial court misled the jury when it interspersed within that instruction language indicating that a conspirator is responsible for all "homicides" and "criminal acts" committed by a coconspirator, without reference to the fact that, according to the defendant, *any* reckless act that could serve as the basis for a conviction of manslaughter in the first degree could not, as a matter of law, have been reasonably foreseeable. Because we conclude herein that a reckless act may be reasonably foreseeable in the context of a criminal conspiracy such as the one in the present case, we conclude that the trial court's instruction in this regard was not improper.

As the state correctly points out, however, the defendant was charged with conspiracy to commit *robbery*, and not conspiracy to commit reckless manslaughter, the latter of which the state concedes would not be a cognizable crime under Connecticut law. See *State* v. *Beccia*, supra, 199 Conn. 5; *State* v. *Almeda*, supra, 189 Conn. 309. Accordingly, the only relevant intent on the part of the defendant was his intent as it related to the conspiracy to rob Jerjies. Once the state had proven the defendant's commission of that crime, the jury was entitled to convict the defendant of reckless manslaughter in connection with Sedor's death, regardless of whether the defendant could or did specifically intend for Taylor to kill her either recklessly or intentionally, so long as the jury could conclude that it was reasonably foreseeable that Taylor would kill her in such a manner. See *State* v. *Martinez*, supra, 278 Conn. 613–15; *State* v. *Coltherst*, supra, 263 Conn. 494, 499. Thus, the defendant's reliance on *Beccia* and *Almeda*, both of which focused on whether a defendant can be convicted of a crime requiring an intent to commit a reckless act, is misplaced, because intent and foreseeability are two entirely different legal concepts. Simply put, the fact that the defendant could not logically have *intended* for Taylor to kill Sedor in a reckless manner does not necessarily mean that it was not *reasonably foreseeable* that Taylor would in fact do so.

Indeed, the facts of the present case illustrate the fallacy of the defendant's claim that a reckless act cannot be a naturally and reasonably foreseeable consequence of the conspiracy such as the one here. Specifically, the evidence demonstrated that: (1) both Taylor and the defendant were armed when they entered Jerjies' apartment; (2) the plan called for Taylor and the defendant to invade an occupied home and to "use force" to commit the robbery; and (3) prior to entering the apartment, Taylor expressly had indicated

to his coconspirators that he intended to use his shotgun, and that people could get hurt if Jerjies and Sedor did not cooperate. The act of firing a loaded shotgun at or near a person or otherwise forcefully using such a weapon with the intent to subdue that person is, by definition, the epitome of reckless conduct creating a grave risk of death under circumstances evincing an extreme indifference to human life, as contemplated by § 53a-55 (a) (3). It is almost impossible to fathom, therefore, that it would be unforeseeable that Taylor, after expressly indicating an intent to engage in such conduct during the robbery, would in fact engage in that very conduct and thereby unintentionally cause Sedor's death. See *State* v. *Rossi*, 132 Conn. 39, 44, 42 A.2d 354 (1945) ("crimes against the person like robbery . . . are, in common experience, likely to involve danger to life in the event of resistance by the victim or the attempt of the perpetrator to make good his escape and conceal his identity"), overruled in part on other grounds by *State* v. *Tomassi*, 137 Conn. 113, 123, 75 A.2d 67 (1950); see also General Statutes § 53a-54c (robbery is predicate crime for felony murder liability).

Accordingly, we conclude that, because it is possible for the commission of a reckless crime to be a reasonably foreseeable consequence of a conspiracy to commit robbery, a conviction of reckless manslaughter predicated on *Pinkerton* liability constitutes a cognizable crime under Connecticut law. The trial court, therefore, did not commit plain error in the present case by instructing the jury on the defendant's liability under the *Pinkerton* doctrine with respect to his requested charge of reckless manslaughter.

2

Alternatively, even if manslaughter in the first degree predicated on *Pinkerton* liability represents a cognizable crime under Connecticut law, the defendant further

claims that his conviction of that crime should be vacated because the nexus between his role in the conspiracy and the subsequent killing of Sedor was so attenuated that it would be unfair to hold him vicariously liable for Taylor's conduct. See, e.g., *State* v. *Diaz*, supra, 237 Conn. 530. In support of his claim, the defendant points out that: (1) he was not the ringleader of the conspiracy; (2) Sedor's death had not been the object of the conspiracy; (3) Sedor's death was not charged as an overt act in support of the conspiracy; (4) he did not kill Sedor and did not have any intent to do so; and (5) Sedor was not in fact killed until after the defendant had fled the apartment. Although these facts may support the conclusion that the defendant did not intend, and was not directly involved in the actual killing of Sedor, they do not, however, demonstrate that his role in the conspiracy itself was so attenuated that *Pinkerton* liability may not be imposed. To the contrary, the jury reasonably could have found that the defendant had been a fully engaged member of the conspiracy and had played an integral role in carrying out the robbery, even going so far as to forcibly enter Jerjies' apartment with a dangerous weapon, to use that weapon in order to help facilitate the crime and then to depart from Jerjies' apartment with the fruits of the crime. See id., 529 ("where . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct"). Accordingly, we conclude that the defendant's claim is without merit.

## II

The defendant next claims that the trial court improperly instructed the jury on the concept of consciousness

of guilt. The following additional facts are relevant to our resolution of this claim. At trial, Lawrence testified that the defendant had asked him prior to trial if Lawrence intended to testify against the defendant, and he also indicated to Lawrence that he had written to Lawrence's mother asking her to tell Lawrence not to testify. Lawrence further testified that the defendant had indicated to him that he knew people who were housed in Lawrence's dormitory area, and that Lawrence had heard the defendant tell another detainee that Lawrence was going to testify against the defendant. In light of this testimony, the trial court instructed the jury: "You may recall that there was testimony by . . . Lawrence to the effect that the defendant made certain statements to . . . Lawrence about his anticipated testimony. This conduct by the defendant may lead you to infer that [the defendant] was conscious of his guilt, and that his statements and conduct were influenced by that consciousness. So if you determine that the statements were made by [the defendant], and that they tend to show a consciousness of guilt, you are instructed that such conduct—you may use that evidence, but you are instructed that such conduct does not raise a presumption of guilt. It's up to you, as judges of the facts, to decide whether the statements or conduct of the defendant in fact reflects a consciousness of guilt, and consider that in your deliberations."

The defendant claims that this instruction improperly put the court's imprimatur on the state's version of events, and thereby bolstered the state's case by supporting Lawrence's uncorroborated testimony and suggesting that the inference of guilt to be drawn from that testimony is, at least, favored by the law. The defendant concedes, however, that his claim was not preserved at trial, and he seeks review as constitutional error under *State* v. *Golding*, supra, 213 Conn. 239–40. The defendant also concedes that "[t]his court repeatedly

has held that consciousness of guilt claims, including claims involving [instructional error], are not constitutional and, therefore, are not subject to *Golding* review."[16] *State* v. *Luster*, 279 Conn. 414, 421–22, 902 A.2d 636 (2006). Although the defendant appears to seek reconsideration of our previous holdings to that effect, he has not provided any reason why we should overrule those cases. Accordingly, we decline to review the defendant's claim under *Golding*.

Alternatively, the defendant requests this court to exercise its supervisory powers to create a rule barring the type of consciousness of guilt instructions given in the present case. We decline the defendant's request. Although "[a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 290 n.11, 750 A.2d 1059 (2000). "Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance where these traditional protections are inadequate to ensure the fair and just administration of the courts." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998).

[16] The defendant acknowledges that he brings this claim in order to exhaust his state remedies and to preserve the issue for federal review.

In the present case, the instructions given by the trial court properly allowed the jury to draw a *permissive* inference of the defendant's guilt on the basis of Lawrence's testimony. See *State* v. *Luster*, supra, 279 Conn. 422 and n.3. Although the trial court did refer to Lawrence's testimony in a general manner, and related that testimony to the concept of consciousness of guilt, such an instruction was not improper because "it is [the judge's] duty to inform the jury what the law is as applicable to the facts of the case . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Hines*, supra, 243 Conn. 816, quoting *Laukaitis* v. *Klikna*, 104 Conn. 355, 360, 132 A. 913 (1926). Moreover, in giving its instruction, the trial court did not explicitly or implicitly express any opinion as to the veracity of Lawrence's testimony, or whether that testimony, if believed, demonstrated a consciousness of guilt on the part of the defendant. Rather, the trial court clearly stated that it was the jury's duty both to determine whether "the statements were made by [the defendant] . . . that [the statements] tend to show a consciousness of guilt" and that, even if the jury so concluded, such evidence "does not raise a presumption of guilt" but, rather, simply may be used by the jury in its deliberations.

We repeatedly have refused to exercise our supervisory authority to alter or to bar similar consciousness of guilt instructions in the context of the defendant's flight. See, e.g., *State* v. *Luster*, supra, 279 Conn. 422–23 n.3, 426; *State* v. *Figueroa*, 257 Conn. 192, 196–97 and n.8, 777 A.2d 587 (2001); *State* v. *Hines*, supra, 243 Conn. 811 n.10, 816; *State* v. *Groomes*, 232 Conn. 455, 473–74 and n.14, 656 A.2d 646 (1995). The defendant has not presented us with a compelling reason to deviate from those conclusions and, accordingly, we decline his invitation to exercise our supervisory powers in the circumstances of the present case.

## III

The defendant's final claim is that the trial court improperly diluted the state's burden of proof, thereby violating his constitutional right to due process, when it instructed the jury that reasonable doubt "is a doubt for which you can, in your own mind, conscientiously give a reason. A reasonable doubt, in other words, is a real doubt, an honest doubt . . . . It is the kind of doubt which, in the serious affairs which concern you in everyday life, you would pay heed and attention to." The defendant concedes, however, that we recently have rejected virtually identical claims of instructional error on the ground that such language, when viewed in the context of the entire charge, is not misleading or confusing.[17] See, e.g., *State* v. *Davis*, 283 Conn. 280, 332–37, 929 A.2d 278 (2007); *State* v. *Tucker*, 226 Conn. 618, 651–52, 629 A.2d 1067 (1993). We cannot discern, and the defendant has not pointed to, a significant difference between the instructions given in those cases and those given here. We see no reason to deviate from our prior holdings on this issue and, accordingly, we conclude that the defendant's claim is without merit.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[17] The defendant acknowledges that he brings this claim in order to exhaust his state remedies and to preserve the issue for federal review.