ANTHONY COWARD *v.* COMMISSIONER
OF CORRECTION
(AC 33937)

DiPentima, C. J., and Sheldon and Schaller, Js.

Argued March 18—officially released July 2, 2013

*William A. Adsit*, assigned counsel, for the appellant (petitioner).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Matthew C. Gedansky*, state's attorney, and, on the brief, *Erika L. Brookman*, assistant state's attorney, and *Angela R. Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. The petitioner, Anthony Coward, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his second amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal and improperly denied his claims of ineffective assistance of trial counsel. We dismiss the appeal.

The petitioner's underlying conviction was the subject of a direct appeal to our Supreme Court. *State* v. *Coward*, 292 Conn. 296, 972 A.2d 691 (2009). In affirming

the petitioner's conviction, the court concluded that the jury reasonably could have found the following relevant facts. "On the evening of December 3, 2002, the [petitioner], Keith Taylor and Maurice Lawrence met in New Haven to discuss a plan to rob Wahied Jerjies, a drug dealer with whom Taylor had had prior dealings. Taylor, who owed an outstanding drug debt to Jerjies, was aware that Jerjies regularly kept large sums of money in his apartment, and suggested that the three men drive to that apartment to rob him.

"After discussing the idea in New Haven, the three men subsequently drove to the Mill Pond Village housing complex in East Windsor, where Jerjies lived with his wife, Sara Sedor, and Sedor's daughter. Lawrence, who previously had lived in that same complex, directed the other men to his unoccupied former apartment, where they further discussed their plan to rob Jerjies. During those discussions, Taylor left to retrieve a shotgun from his girlfriend's apartment, which also was located in the Mill Pond Village complex. When he returned, Taylor described the plan for the robbery to the others, explaining that Lawrence would serve as a lookout, while Taylor and the [petitioner] would go inside Jerjies' apartment and 'use force' to take what they wanted. Taylor directed the [petitioner] to bring a baseball bat that Lawrence had produced from his apartment, while Taylor would use the shotgun that he had obtained. Taylor indicated to the others that the shotgun had only one shot, that he was going to use it if necessary and that people could get hurt if Jerjies or Sedor resisted.

"Thereafter, the three men went to Jerjies' apartment, where they were met at the door by a woman who indicated that Jerjies was not home. They decided to wait for Jerjies nearby and, after Jerjies returned, Taylor and the [petitioner] went to the front door of Jerjies' apartment while Lawrence hid by bushes located at the

side of the apartment. When Jerjies answered the door, Taylor pointed the shotgun at Jerjies' chest and forced his way into the apartment. After following Taylor inside, the [petitioner] encountered Sedor in the living room, at which point he began swinging his baseball bat at her in order to keep her away from him.

"Subsequently, Taylor directed Lawrence to search the apartment for valuables, and also directed the [petitioner] to grab Jerjies' Sony PlayStation II video game system. After Lawrence found a bag of marijuana, the [petitioner] and Lawrence ran from the apartment through a rear screen door and, as they fled back to Taylor's car, they heard a gunshot ring out from inside the apartment. Lawrence and the [petitioner] returned to Taylor's car and, approximately twenty minutes later, Taylor returned to the car with a 'splatter of blood on his clothes.' Taylor indicated that he had dumped the shotgun in a nearby sewer, and that he had left the baseball bat in the apartment. Thereafter, the three men drove back to New Haven to drop off the [petitioner], who left the car in possession of the Sony PlayStation II, some marijuana and $200 in cash from the robbery.[1]

---

[1] "The [petitioner] disputed certain aspects of this version of events at trial through the submission of a written declaration given to the police. In that declaration, the [petitioner] stated that, although Taylor had mentioned the possibility of stealing a car that night, the [petitioner] was not aware from whom the car would be stolen or how it would be stolen. The [petitioner] further stated that, during the time in which the three men were waiting in Lawrence's apartment for Jerjies to return, they did not discuss a plan to rob Jerjies, but simply engaged in general conversation. The [petitioner] stated that Taylor and Lawrence had left in the middle of that conversation for about twenty minutes and that the [petitioner] did not know where they went or what they were doing, but that he was aware that Taylor's girlfriend and child lived in that same housing complex. When Taylor and Lawrence returned, the [petitioner] stated that the three of them went to Jerjies' apartment, where they were let in voluntarily. According to the [petitioner], once inside the apartment, Taylor pulled out a concealed shotgun from his jacket and began yelling and asking Jerjies where the marijuana was. The [petitioner] also stated that Lawrence—and not the [petitioner]—produced the aluminum baseball bat from inside his jacket, and that that was the first time that the [petitioner] became aware of the

"After receiving a telephone call from one of Jerjies' neighbors the next day, Jeffrey Capen, an East Windsor police officer, responded to the crime scene and found both Jerjies and Sedor dead in the apartment. Investigators discovered the baseball bat in the apartment, but subsequent testing did not reveal any trace of human blood on the bat. Investigators also discovered various broken pieces of the shotgun near Sedor's body, including two wooden pieces of the shotgun fore-ends, a metal spring and a U-shaped piece of metal that was entangled in Sedor's hair. Investigators also subsequently located the wooden stock and barrel of the shotgun, which bore traces of human blood, in the sewer in which Taylor had discarded it. Edward Jachimowicz, a state firearms examiner, testified that it would have taken 'a tremendous amount of force' to break the shotgun apart in such a manner. Autopsies subsequently revealed that Jerjies had died from a shotgun wound to his neck that 'obliterated . . . [it] from its normal anatomic function,' and that Sedor had succumbed to extensive blunt force trauma to her head.

"Taylor and Lawrence subsequently were arrested in connection with the murders, and the [petitioner] surrendered voluntarily. The state charged the [petitioner] with capital felony in violation of General Statutes §§ 53a-54b (7) and 53a-8 (a), two counts of murder in violation of § 53a-54a (a), two counts of felony murder in violation of § 53a-54c, robbery in the first degree in violation of § 53a-134 (a) (2), burglary in the first degree in violation of § 53a-101 (a) (1), conspiracy to commit robbery in the first degree in violation of §§ 53a-48 (a) and 53a-134 (a) (2) and conspiracy to commit burglary in the first degree in violation of §§ 53a-48 (a) and 53a-101 (a) (1). The [petitioner] was tried before a

existence of either weapon. The [petitioner] further averred that Taylor took the bat from Lawrence and hit Sedor over the head with it." *State* v. *Coward*, supra, 292 Conn. 301 n.7.

jury, which returned a verdict convicting him of all charges except for the capital felony count and the murder count in connection with Sedor's death. The [petitioner] was, however, convicted of the uncharged lesser included offense of manslaughter in the first degree in connection with Sedor's death. The trial court sentenced the [petitioner] to a total effective sentence of sixty years imprisonment." *State* v. *Coward*, supra, 292 Conn. 299–302.

On December 28, 2010, the petitioner filed the operative second amended habeas corpus petition alleging that his trial counsel, attorneys Margaret Levy and John Walkley, provided ineffective assistance because, inter alia,[2] they (1) "[advised] the petitioner against testifying in his own defense" and (2) "failed to investigate and interview several witnesses who could have provided exculpatory evidence at trial."[3] Following the habeas trial, the court denied the petition for a writ of habeas corpus and subsequently denied the petitioner's petition for certification to appeal. This appeal followed. Additional facts and procedural history will be set forth as necessary.

As an initial matter, we set forth the standard of review relevant to our resolution of this appeal. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among

---

[2] The petitioner also alleged that his trial counsel provided ineffective assistance at his criminal trial because they "failed to call alibi witnesses." On appeal, however, the petitioner does not challenge the habeas court's denial of this claim.

[3] Despite alleging in his habeas corpus petition that his trial counsel were ineffective for failing to investigate "several witnesses," on appeal, as at the habeas trial, the petitioner limits his second claim to trial counsels' failure to investigate Taylor as a potential exculpatory witness.

jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed." (Internal quotation marks omitted.) *Rosado* v. *Commissioner of Correction*, 129 Conn. App. 368, 371–72, 20 A.3d 85, cert. denied, 302 Conn. 916, 27 A.3d 368 (2011).

"We examine the petitioner's underlying claim[s] of ineffective assistance of counsel in order to determine whether the habeas court abused its discretion in denying the petition for certification to appeal. Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] the United States

Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." (Citation omitted; internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, 128 Conn. App. 425, 429–30, 17 A.3d 1089, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011).

"To satisfy the performance prong [of the *Strickland* test] the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Boyd* v. *Commissioner of Correction*, 130 Conn. App. 291, 294–95, 21 A.3d 969, cert. denied, 302 Conn. 926, 28 A.3d 337 (2011). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Orellana* v. *Commissioner of Correction*, 135 Conn. App. 90, 98, 41 A.3d 1088, cert. denied, 305 Conn. 913, 45 A.3d 97 (2012).

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that

counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *Vazquez* v. *Commissioner of Correction*, supra, 128 Conn. App. 430.

Accordingly, in order to determine whether the habeas court abused its discretion in denying the petition for certification to appeal, we must consider the merits of the petitioner's underlying claim that trial counsel provided ineffective assistance. With the foregoing principles in mind, we now address the petitioner's claims in turn.

I

The petitioner first claims that Levy and Walkley provided ineffective assistance because they improperly advised him not to testify and failed to ensure that he understood the implications of not testifying. Specifically, the petitioner asserts that, because he "evinced a desire to testify by implication," it was incumbent upon Levy and Walkley to inform him that they did not intend to challenge his statement to the police through the presentation of evidence. Accordingly, the petitioner argues, because "it is clear [the petitioner's] testimony was the only way his purported statement could be challenged as he wanted . . . [Levy and Walkley] were deficient for not advising him he would need to testify to challenge his purported statement." We disagree.

The record reveals the following additional facts, which are relevant to the resolution of this claim. During his criminal trial, when the petitioner was canvassed by the trial court concerning his right to testify, he clearly indicated his understanding that he had such a right. During the canvass, the trial court explained that he could challenge the veracity of his statement to the police by testifying but warned the petitioner that, "[i]f you do testify, then you'll be giving up your [f]ifth [a]mendment right, and you'll be treated like any other witness, subject to cross-examination. You can't say 'I don't want to answer that question, I take the [f]ifth [a]mendment,' because you'll be giving up that right if you do choose to testify." The petitioner acknowledged that he understood that the decision as to whether to testify was his own and that he had decided not to testify.

At the habeas trial, the court heard testimony from the petitioner and Levy regarding, inter alia, the issues involving the petitioner's decision not to testify. The petitioner testified that Levy and Walkley had discussed with him the idea of testifying at his criminal trial and advised against it. He testified that he had informed them of his desire to testify to inform the jury of his "side of the story." The petitioner testified, however, that he had understood that ultimately it had been his right to decide whether to invoke his right to testify on his own behalf. Levy testified that the decision not to call the petitioner as a witness was a strategic decision made to prevent the state from having an opportunity to cross-examine him regarding the inculpatory statement he had made to the police.

In its memorandum of decision denying the petitioner's habeas corpus petition, the court stated: "Given the particularly damaging nature of [the petitioner's statement to the police] and the testimony it could elicit, [the decision not to call the petitioner as a witness]

was eminently reasonable. Absent any credible evidence indicating that [Levy and Walkley] failed to inform the petitioner of his right to testify or that the decision not to place him on the stand was unreasonable in light of the circumstances existing at the time, this court cannot conclude that [their] performance was deficient."

"It is axiomatic that [i]t is the right of every criminal defendant to testify on his own behalf . . . and to make that decision after full consultation with trial counsel. . . . [A]lthough the due process clause of the [f]ifth [a]mendment may be understood to grant the accused the right to testify, the if and when of whether the accused will testify is primarily a matter of trial strategy to be decided between the defendant and his attorney." (Citation omitted; internal quotation marks omitted.) *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 195–96, 19 A.3d 705, cert. denied, 303 Conn. 901, 31 A.3d 1117 (2011).

The petitioner claims that it was objectively unreasonable for Levy and Walkley not to call him as a witness to challenge his statement to the police. He claims that that failure was prejudicial to him because his testimony could have cast doubt on Lawrence's inculpatory testimony. Specifically, he argues that he would have testified that "he went along to meet Taylor's son and had no idea of Taylor and Lawrence's plan until Taylor pulled out the shotgun, at which time the petitioner indicated his noninvolvement by taking nothing and running out of the apartment." The petitioner further claims that he would have testified that Lawrence, rather than the petitioner, wielded the baseball bat and the petitioner never took Jerjies' Sony PlayStation II video game system. The petitioner claims that such testimony would have changed the outcome of the trial.

On the basis of our review of the record, we cannot conclude that the habeas court erred in determining

that Levy and Walkley's representation fell within the range of reasonable professional assistance. The petitioner failed to present any credible evidence from which the habeas court could have found that their advice was so deficient as to have left the petitioner to make a wholly uninformed decision as to whether to testify. The petitioner was canvassed by the trial court about his right to testify. He was informed that the state would have been permitted to use his statement to the police for impeachment purposes. After explaining such risks, the trial court asked the petitioner three times whether he wanted to testify and the petitioner stated three times that he did not want to testify.

The habeas court properly based its ruling on the petitioner's failure to satisfy his burden of overcoming the strong presumption that Levy and Walkley provided effective assistance in this matter. The petitioner's claims are not persuasive because they are directed at Levy and Walkley's trial strategy. "[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . .

"[T]here is a strong presumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . . It is well established that [a] reviewing

court must view counsel's conduct with a strong presumption that it falls within the wide range of reasonable professional assistance and that a tactic that appears ineffective in hindsight may have been sound trial strategy at the time." (Citations omitted; internal quotation marks omitted.) *Boyd* v. *Commissioner of Correction*, supra, 130 Conn. App. 297–98.

Contrary to the petitioner's arguments, Levy and Walkley did not provide ineffective assistance simply because they failed to call the petitioner as a witness. At the criminal trial, they unambiguously attempted to demonstrate, through cross-examination of the state's witnesses, that the petitioner had not known about or agreed to the robbery plan prior to the incident in order to negate the state's theory of liability on charges of accessory to commit murder. Walkley conducted a thorough cross-examination of Lawrence, during which he probed the petitioner's involvement in the planning and execution of the robbery. Levy's testimony at the habeas hearing reflects that Levy believed that this was sound trial strategy; she explained that she and Walkley believed that it was better to raise arguments related to the petitioner's intent through cross-examination of the state's witnesses rather than through the testimony of the petitioner, which would have given the state the opportunity to elicit additional incriminating information. The habeas court, in its thorough evaluation of the evidence, reasonably found that Levy and Walkley's decision to advise the petitioner not to testify constituted reasonable professional assistance. Our review of the issues raised in connection with this claim leads us to conclude that the court did not abuse its discretion in denying the petition for certification to appeal with regard to this claim.

II

The petitioner's second claim is that Levy and Walkley provided ineffective assistance because they failed

to investigate Taylor as a potential exculpatory witness. The petitioner claims that such failure prevented them from presenting to the jury Taylor's testimony that the petitioner was present during the incident but that he was not involved in either the robbery or the deaths of the victims. We disagree.

In rejecting the petitioner's ineffective assistance claim against Levy and Walkley regarding the investigation of Taylor as an exculpatory witness, the habeas court specifically credited Levy's testimony and found that "[t]he petitioner has submitted no evidence demonstrating that . . . his attorney's decision not to pursue Taylor as a possible witness was, in light of this information, unreasonable." Levy testified that " [she and Walkley] were afraid . . . Taylor, based on his statement to the police, would be the most devastating of witnesses, if he were brought [to testify]." Levy testified that "quite early on [she and Walkley] had spoken with [one of Taylor's former trial attorneys] about the possibility of interviewing . . . Taylor and [the attorney] refused that opportunity."

The habeas court further found that "although Taylor presented testimony at the habeas corpus proceeding that completely contradicts his prior statement to the police about the petitioner's involvement, the court finds Taylor's testimony totally lacking in credibility." In Taylor's statement to the police, he implicated the petitioner in the charged crimes, stating that the petitioner had actively participated in the robbery and killed the victims. At the habeas hearing, however, Taylor presented testimony that completely contradicted his prior statement to the police. Taylor testified that he, rather than the petitioner, killed the victims and that the petitioner did not know about the planned robbery prior to the incident. Taylor testified that the petitioner "wasn't involved in [the plan to rob the victims]. He

wasn't supposed to—this wasn't something that he should be involved in at all."

"As an appellate court, we do not reevaluate the credibility of testimony . . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . . This court does not retry the case or evaluate the credibility of witnesses. Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *Corbett* v. *Commissioner of Correction*, 133 Conn. App. 310, 316–17, 34 A.3d 1046 (2012).

The petitioner has provided nothing to overcome the presumption that Levy and Walkley's tactical decision not to pursue Taylor as a witness was anything other than sound trial strategy. See *Orellana* v. *Commissioner of Correction*, supra, 135 Conn. App. 98. Indeed, Taylor's statement to the police bolsters Levy's testimony that she and Walkley believed that "[t]here was absolutely no reason for us to think that . . . Taylor would have been helpful to us or to [the petitioner] at trial." On the basis of the testimony and evidence presented at the habeas trial, we conclude that the habeas court reasonably could have found that Levy and Walkley were not ineffective in their investigation of Taylor as an exculpatory witness. Accordingly, we agree with the habeas court that the petitioner failed to demonstrate that their performance was deficient and further conclude that the petitioner's claim fails under the first prong of *Strickland*.

On the basis of the foregoing, this court concludes that the petitioner has not demonstrated that any issue

raised with regard to the court's denial of his petition for a writ of habeas corpus is debatable among jurists of reason, that a court could resolve any such issue in a different manner or that any question raised deserves encouragement to proceed further. Having failed to satisfy any of these criteria, the petitioner cannot demonstrate that the court abused its discretion in denying the petition for certification to appeal. See *Simms* v. *Warden*, 230 Conn. 608, 616, 646 A.2d 126 (1994).

The appeal is dismissed.

In this opinion the other judges concurred.