## STATE OF CONNECTICUT *v.* CHRISTOPHER E.*
## (AC 30359)

Gruendel, Beach and Borden, Js.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued November 10, 2010—officially released March 1, 2011

*William B. Westcott*, special public defender, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Ann F. Lawlor*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Christopher E., appeals from the judgment of conviction, rendered after a jury trial, of four counts of risk of injury to a child in violation of General Statutes § 53-21 (a), three counts of reckless endangerment in the first degree in violation of General Statutes § 53a-63 (a), two counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), unlawful discharge of a firearm in violation of General Statutes § 53-203, assault in the third degree in violation of General Statutes § 53a-61 (a) (3), assault of an elderly person in the third degree in violation of General Statutes § 53a-61a (a) (1) and disorderly conduct in violation of General Statutes § 53a-182 (a) (1). The defendant claims that his constitutional right to a fair trial was violated by the admission into evidence of certain inadmissible material and that the trial contained numerous other constitutional violations. We affirm the judgment of the trial court.

The defendant was charged in an amended information with all of the above violations.[1] The jury found him guilty of all of the charges, and the court rendered judgment, sentencing him to a total effective term of twelve years incarceration, execution suspended after fifty-four months, followed by five years of probation. This appeal followed.

---

[1] The defendant had also been found guilty of the crime of criminal use of a firearm in violation of General Statutes § 53a-216 (a), but the court vacated the verdict as to that count, and the charge was dismissed.

The jury reasonably could have found the following facts. On May 16, 2004, the defendant and his wife, along with four of their children, C, age fifteen, M, age fourteen, E, age twelve, and S, age three, attended church. On the ride home in their family vehicle, the defendant and his wife began to argue over finances and then dropped the children off at their home in Hamden, which they shared with the defendant's parents.[2] The argument escalated as the defendant and his wife returned later to the home.

At the home, the defendant's wife attempted to call 911, but the defendant ripped the telephone out of the wall. He then went outside and retrieved a shotgun from his Mercedes Benz automobile, which was parked there. C, who saw the defendant get the shotgun from his vehicle, locked the door to the house and told her siblings to run because her father had a gun. The defendant returned to the house with the shotgun and, encountering the locked door, shot the door three times, causing it to shatter into the house's entryway. The defendant's father and E were hit and injured by flying shrapnel from the door or shotgun pellets. The defendant's father fell down, and E fled from the house.

Meanwhile, C and M had fled from the house to the nearby house of their aunt, U, where M, who was terrified, nervous and out of breath, called 911 and told the dispatcher that he had just run from his house where his father was shooting a gun. He also expressed fear for the safety of S, E and his mother, who were then still in the house.

E soon escaped from the house and ran to a neighbor's house, where she called 911 and her aunt, O, who then went to the house to rescue S. The defendant then ordered O to leave. She left the house with S and then

---

[2] The defendant's father was sixty-nine years old.

called 911, stating that the defendant was ranting and raving, and had a long gun in the house.

Soon thereafter, the police and a SWAT team arrived and set up a "perimeter"[3] around the house, in which the defendant was keeping his wife and his father as hostages. A New Haven police detective, who also was related to the defendant, contacted the defendant on the telephone to negotiate his surrender and the release of the defendant's wife and father. Nearly one and one-half hours after the first gunshots had been fired, the defendant released his wife and then his father, and surrendered himself.

## I

The defendant first claims that his federal constitutional right to a fair trial was violated because the court failed to exclude certain prior misconduct evidence and certain evidence of erased proceedings, and permitted the trial to be "taken over" by inquiry into wholly collateral matters. Acknowledging that he had not objected at trial to any of the evidence that he challenges on appeal, the defendant seeks to prevail under *State* v. *Golding*, 213 Conn. 239–40, 567 A.2d 823 (1989), the plain error doctrine; see Practice Book § 60-5; and this court's supervisory authority over the administration of justice. We reject the defendant's claim.

At trial, there was no dispute about the fact that gunshots had been fired. The state's theory was that the defendant had fired the gunshots and held his wife and his father as hostages. The defense theory was that no one had been held hostage and that the defendant's wife, not the defendant, had done the shooting. Thus,

---

[3] The Hamden police officer in charge of the SWAT team, Captain John Lujick, explained that a "perimeter" is a "containment area . . . to keep whatever the problem is within that area"; the team did not want anyone to get out of that area because "a mobile hostage situation is much worse than a contained situation."

the two principal contested issues were (1) who had fired the gunshots and (2) whether hostages had been taken.

The state's principal evidence regarding the two contested issues consisted of the following. Upon leaving the house, the defendant's wife, who was hysterical, had told Captain John Lujick of the Hamden police, who was in charge of the SWAT team, that she was to blame. Based, however, on the information known to him at that time, namely, the numerous 911 calls identifying the defendant as the perpetrator, the fact that the defendant's wife had been the first of the purported hostages to leave the house, the way the hostage situation had unfolded and her demeanor, Lujick did not believe her. Approximately two hours after the incident, Detective Sean Dolan of the Hamden police interviewed C, M and E at an aunt's house. In electronically taped statements, which were later introduced into evidence as substantive evidence,[4] all three children stated that the defendant and their mother had been arguing, that the defendant ripped the telephone from the wall, retrieved a gun from his car and shot the locked door, and that they fled from the house. In the 911 calls introduced by the state, each caller identified the defendant as having the gun and shooting it. Both C and O had seen the defendant with the gun in his hands. Furthermore, the three taped statements of the children, which had been taken individually and outside the presence of each other, were consistent in describing the incident as follows. After the family returned from church, the three children went into the house. The defendant and their mother remained in the car, arguing, and then drove away in the family vehicle, returning several minutes later. The argument continued as the defendant and their mother returned to the

[4] See *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

house. The defendant ripped the telephone off the wall and then went outside, got the shotgun from his Mercedes and shot through the door of the house, wounding both his father and E, and reentered the house. In addition, there was testimony that the defendant's father, in response to a question by Deputy Chief John Capiello of the Hamden police as to whether he believed that he had been a hostage, told Capiello that he did not ask to leave the house and that he knew he could not leave because the defendant was holding a gun.

The defendant's theory of defense was supported by several witnesses. Police officers testified that both the defendant and his wife stated shortly after the incident that she was the person responsible for the firing of the shotgun. C, M and E recanted their taped statements at trial. C testified that all she remembered of the incident was walking away from the house, seeing her mother go to the car and hearing a "big bang." E testified similarly, stating that after her mother and the defendant returned to the house, she and her sister and brother were "walking up the hill" to the house when the defendant went into the house, and her mother "grabbed a gun" and "shot at the door." E testified that she then ran to a neighbor's house and called 911. M testified that as he and his sisters were walking up the hill to their house he heard gunshots, that he turned and looked at his sister, who said, "mommy has a gun," and that he said, "say daddy did it . . . ." He and C then went to their aunt's house, where he called 911. All three children testified that their aunt K, at whose house and in whose presence their statements had been taped, told them what to say in their taped statements. In addition, both the defendant's wife and the defendant testified that it was the defendant's wife, not the defendant, who retrieved the gun from the vehicle and shot through the door of the house.

On cross-examination, the defendant testified that he and his wife had never before argued about finances. The state then asked him whether, on a previous occasion, he had fought with Hamden police officers, who were at his home in connection with a protective order that had been issued against him as a result of a prior incident involving him and his wife. The defendant testified that he did not recall the incident and then on redirect examination denied that the incident had occurred.

In its rebuttal case, the state called Sergeant John Testa of the Hamden police department for the purpose of impeaching the defendant's testimony that the incident had never occurred. Testa testified that, on November 1, 2000, he and several other officers went to the defendant's home to serve a search warrant for weapons in connection with a restraining order that had been issued against the defendant, that the defendant initially refused to let the officers enter the house and that after they entered, "we ended up getting into an altercation with him where he was arrested and charged with interfering with a search warrant, interfering with [a] police officer, disorderly conduct and also narcotics charges." The court immediately gave an instruction to the jury limiting its consideration of Testa's testimony to the defendant's credibility and cautioning the jury that the evidence was not offered for the truth of any prior events or to show that the defendant had a "bad character" or a "propensity for acting in any particular way under any circumstances."[5] Both the state and the

---

[5] The following is the entirety of the court's limiting instruction: "You have just received certain information from this witness concerning his experience with certain prior events. The state has offered this witness, and I have allowed you to hear this witness on this subject for the sole purpose of enabling you to determine whether or not you believe the credibility of a prior witness, here, the defendant, as to certain issues for which he provided testimony before you. This particular witness, that is, Sergeant Testa's testimony now, was not offered to prove the truth of any information about prior events. It was not offered to show that the defendant has a bad character or to show that the defendant has a propensity for acting in any

defendant expressed satisfaction with the court's limiting instruction.

The state then presented James Turcotte, the supervisory assistant state's attorney in the courthouse in which the case was being tried. Turcotte testified that, in connection with the incident of May 16, 2004, for which the defendant was on trial, the defendant's wife had applied for and been granted entry into a diversionary program known as the family violence education program and that she had successfully completed that program. Turcotte also testified that in 2006 charges against her in connection with that incident had been dismissed and principles of double jeopardy precluded any further prosecution of her.[6]

In surrebuttal permitted by the court, the defendant then explained why he had testified that the incident had never occurred. He testified that the case had been dismissed and that he had received instructions from the court that, if anyone ever asked him about the incident, he was "to say it never happened." The state then cross-examined him to the effect that the court's instructions were likely to have been that, if asked whether he had a prior conviction, he could answer "no." He insisted, however, that the instruction from the court was that he could say the incident never

particular way under any circumstances. It was offered solely for the purpose of assisting you in performing your duty of evaluating the defendant's credibility, as the defendant has testified here before you. You must understand that I have ruled that this testimony has been allowed for the sole purpose I described, that is, to test the credibility of the defendant. You may consider it, you will consider it only as it relates to the limits for which it was allowed. You may not consider, you will not consider [it] for any other purpose as to any other issue."

[6] This evidence apparently was presented to support the state's position at trial that the defendant's children testified as they did, placing the blame on their mother rather than on the defendant, because they knew that she was at no risk of prosecution and, therefore, that the defendant had more to lose as a result of a conviction than she did.

occurred. In this cross-examination, he also denied ever striking a police officer. The state then recalled Testa, who testified that, in that prior incident, the defendant had struck a police officer, namely, a Sergeant Cahill, after which Testa, Cahill and another officer "put [the defendant] into a submissive hold and took him down and arrested him."

The defendant claims that both Testa's testimony and Turcotte's testimony were inadmissible and deprived him of a fair trial. As to Testa's testimony, the defendant claims that it was inadmissible prior misconduct evidence, that it raised wholly collateral matters from which the jury "could only conclude . . . that the defendant was a person of general bad character and that he had a propensity for criminal behavior." In addition, he claims that the "state [impermissibly] used the fact of the defendant's earlier, dismissed case involving the Hamden police for the very purpose the erasure statute is meant to restrict," namely, "to protect innocent persons from the harmful consequences of a criminal charge which is subsequently dismissed." (Internal quotation marks omitted.) Thus, the defendant argues, the "trial court participated in allowing the [state] to impeach him and [make him] appear to be a liar while all the time the defendant explained [that] he had a good faith basis for believing the protection of the statute allowed him to testify as he did." As to Turcotte's testimony, the defendant argues that, knowing that "it could not present evidence from court records of [the] dismissed case [of the defendant's wife], the state did an end run around this by having the head of [the] prosecutor's office testify as to his knowledge of the arrest and subsequent dismissal." This was, the defendant contends, "an unfair use of illegal information and an improper bolstering of the appearance of righteous authority by the state."

A

The defendant, specifically acknowledging that all of this evidence was admitted without any objection by him at trial, claims first that he should prevail on these contentions under *State* v. *Golding*, supra, 213 Conn. 239–40. We disagree.

It is not necessary to repeat here the familiar four-pronged test under *Golding*. Suffice it to say that, in order to prevail under *Golding*, the defendant must satisfy all four of those prongs, the second of which is that the alleged trial court violation was truly of a constitutional nature and not simply a violation of a rule of evidence. *State* v. *Burgos-Torres*, 114 Conn. App. 112, 116–17, 968 A.2d 476, cert. denied, 293 Conn. 908, 978 A.2d 1111 (2009). Assuming without deciding that any or all of the evidence that the defendant challenges on appeal would have been inadmissible if objected to at trial, we conclude that such evidence does not satisfy the second prong of *Golding*. It is purely evidentiary, not constitutional, in nature.

B

The defendant next claims to prevail under the plain error doctrine. We reject this claim.

The plain error doctrine "is not . . . a rule of review-ability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . [I]nvocation of the

plain error doctrine is reserved for occasions requiring the reversal of the judgment under review." (Internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 326, 977 A.2d 209 (2009). Invocation of the plain error doctrine is reserved for instances in which the claimed error is "so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Riggsbee*, 112 Conn. App. 787, 793, 963 A.2d 1122 (2009).

Again, assuming without deciding that any or all of the challenged evidence would have been inadmissible if objected to at trial, its admission did not affect the fairness and integrity of and public confidence in the trial and did not result in a manifest injustice. We have reviewed the record of the trial, including having listened to the tape recordings of the 911 calls and the children's taped statements to Dolan that were admitted pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). We are fully convinced that those tape recordings, which were made while the incident in question was unfolding and shortly after its termination, as well as the rest of the state's evidence, gave more than ample justification for the jury to credit the version of events depicted on those tapes and, from that, other evidence, notwithstanding the recantation of the statements by the defendant's children and the testimony to the contrary by the defendant and his wife. Furthermore, the court's limiting instructions to the jury regarding the prior incident about which Testa testified undermines the defendant's contention that the jury must have concluded that he was a person of bad character with a propensity for criminal behavior. In addition, Turcotte's testimony did not implicate the defendant's testimony in any way; it related only to the motives of the defendant's wife and their children for testifying as they did.

C

Finally, the defendant seeks reversal of the judgment under our inherent supervisory power over the administration of justice. This is not an appropriate case for the extraordinary invocation of that power.

"Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance where these traditional protections are inadequate to ensure the fair and just administration of the courts." (Internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 315, 972 A.2d 691 (2009).

This appeal plainly does not meet this very stringent standard. The claimed evidentiary errors, to which no objection was made, do not implicate the perceived fairness of the judicial system as a whole. See *State* v. *Eason*, 116 Conn. App. 601, 608 and n.2, 976 A.2d 797 (court declined to exercise supervisory authority regarding claim that trial court should have sua sponte excluded allegedly prejudicial photographs), cert. denied, 294 Conn. 902, 982 A.2d 646 (2009).

II

As his final set of claims, the defendant presents a list of ten alleged constitutional violations that, he contends, "whether jointly or severally, resulted in an unfair trial and invalid convictions for the crimes

alleged, in violation of the defendant's rights under the fourth, fifth, sixth and fourteenth amendments [to] the United States constitution." In fairness to his counsel, we note that this set of claims is presented as follows: "After consultation with the defendant . . . *it is represented* that the following grounds" resulted in an unfair trial and invalid conviction. (Emphasis added.) This assertion is followed by a one and one-half page list of ten alleged violations, without any analysis or discussion, namely, false testimony by Dolan, right to a public trial, reasonable doubt, improper voir dire, improper pretrial identification, presumption of innocence, incomplete evidence, grave doubt, prosecutorial misconduct and insufficient evidence. In addition, appellate counsel advised us at oral argument that these claims were being presented, after much negotiation with the defendant, in connection with the defendant's concerns over potential federal review of his case.

We decline to review any of these alleged violations because they are briefed inadequately. See *State* v. *Reeves*, 118 Conn. App. 698, 700 n.3, 985 A.2d 1068 (2010). Although the defendant *might* be entitled to require his counsel to present claims that his counsel may not be able in good faith to support, he is not entitled to have us review them in the absence of adequate briefing.

The judgment is affirmed.

In this opinion the other judges concurred.